THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EVARISTO SESMAS, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARY ZAMORA, Defendant-Appellant.

Third District    Nos. 3—91—0623, 3—91—0627 cons.

Opinion filed April 27, 1992.

J. Barton Kalish, of J. Barton Kalish & Colleagues, of Chicago, for appellants.

Marc Bernabei, State's Attorney, of Princeton (John X. Breslin and Robert M. Hansen, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GORMAN delivered the opinion of the court:

Defendants were passenger and driver of a car which contained three kilograms of cocaine in a false compartment in the gas tank. Upon conviction at a bench trial, each was given a street-value fine of $1,120,166 and sentenced to 30 years' imprisonment for controlled substance trafficking. We affirm.

On February 4, 1991, Illinois State Trooper James Lower noticed a 1974 Ford LTD driving erratically eastbound on Interstate 80 near Princeton. Lower followed the car and observed it swerve onto the shoulder three more times. At that point, he pulled the car over.

Mary Zamora was driving and Evaristo Sesmas was in the front passenger seat. At the officer's request, both produced identification. When asked who owned the car, Sesmas responded that it belonged to a friend of his named Lou. Zamora then added that the owner was Louis Espendoza. Sesmas eventually found the car's registration in the glove compartment. This indicated that the car belonged to Alejandro Bustillos.

Trooper Lower returned to his squad car to run a check on the driver's licenses and the registration, all of which were from Arizona. The officer was informed that the licenses and registration were valid and that neither defendant had any outstanding warrants. The check also showed that Zamora had previously been arrested, but not convicted, for possession of a weapon and possession of cannabis. Sesmas had no prior record.

Lower then filled out a warning citation and a consent to search waiver. He also called for backup.

Trooper Lower returned to defendants' car, accompanied by Trooper Robert Cessna, who had arrived in response to Lower's request for backup. After Zamora signed the warning citation, Lower returned the defendants' licenses, stating "That's all there is to the stop." Lower then asked Zamora if she had ever been arrested. She initially mentioned only traffic offenses, but admitted the weapon and drug arrests when confronted with the information. In response to in-

quiry by Lower, Zamora denied presently possessing drugs or weapons.

Lower next asked Zamora if she minded if he searched the car. She had no objection, handed the keys to the officer and voluntarily exited the vehicle. Once out of the car, Zamora was asked to sign the consent-to-search form. Trooper Lower explained what it was and that it was voluntary. Zamora signed it.

Trooper Cessna then ordered Sesmas out of the car. During a pat-down search of Sesmas, Cessna found a plastic baggy containing a white powdery substance and placed Sesmas under arrest.

Meanwhile, Zamora told Sgt. Daniel Gillette, the third officer to arrive, that she had a gun in her purse. Sgt. Gillette opened the purse, which was on the front seat, and found a .25 caliber automatic pistol, loaded with one round. The purse also contained a magazine for the weapon, holding three rounds.

Zamora was arrested and read her *Miranda* rights. Zamora and Sesmas were transported to the Bureau County jail.

Trooper Craig Graham was then called to the scene and was told by Lower that a small amount of drugs had been discovered on Sesmas. Graham, a member of the K-9 unit, had his dog Thor search the car. Thor indicated that drugs were under the back seat, but an interior search revealed nothing. Graham looked under the car and noticed that the bolts holding the gas tank in place appeared to have been recently removed.

The car was then towed to a local service station. A fog had developed, making it hazardous to conduct a further search of the car along the roadside. At the garage, the search was continued.

After putting the car up on a hoist, the police removed the gas tank and found a false compartment containing three kilograms of cocaine and an ounce of heroin. Subsequent tests showed that the cocaine was 93% to 95% pure and had a stipulated street value of $1,120,166. In the trunk of the car, police found a suitcase belonging to Sesmas. It held two baggies, one containing $600 in cash and the other containing $1,000 in cash. In Zamora's purse, the police found a pager belonging to Sesmas.

The defendants filed a motion to quash the arrests and suppress the evidence. The court suppressed the drugs that were found on Sesmas, but denied the motion as to the gun and the drugs in the gas tank.

When in custody, Zamora gave a statement to the Bureau County sheriff's department and also testified at the suppression hearing and trial. She stated that she was Sesmas' common-law wife and had lived

with him for 10 years. They had left Phoenix on January 31, 1991. The stated purpose of the trip was to visit Sesmas' uncle in Chicago, but Zamora did not know where he lived. Zamora claimed that they planned to contact a radio station which supposedly helped to locate people. Sesmas had driven the whole way except for the 10 miles preceding their arrest. She denied having knowledge of the drugs and was unsure whose car it was.

Through a Spanish interpreter, Sesmas also gave a statement and testified. He claimed that he had gone to Mexico to visit his mother and it was there he learned his uncle was sick. Upon returning to Phoenix, Sesmas met with a man named El Negro and arranged to drive his car to Chicago. Sesmas claimed that both his and Zamora's cars were not operational. Once he was in Chicago, he was to call a woman who would in turn contact El Negro to pick up the car. Sesmas did not know where his uncle lived, but was going to call his mother, who would find out the address. Sesmas did not know his mother's phone number.

Following a bench trial, Zamora was convicted of possession of a controlled substance with intent to deliver, controlled substance trafficking and armed violence (No. 3—91—0627). Sesmas was convicted of possession of a controlled substance with intent to deliver and controlled substance trafficking (No. 3—91—0623). Each was fined $1,120,166 and sentenced to 30 years' imprisonment on the trafficking count. Because both defendants charge the same errors, the two cases were consolidated on appeal.

The defendants first claim that the trial court erred when it denied the motion to quash arrest and suppress evidence.

■ Initially, we find that the trial court was correct in suppressing the material found during the pat-down search of Sesmas. The right to frisk does not automatically follow the right to stop. (*People v. Kramer* (1991), 208 Ill. App. 3d 818, 566 N.E.2d 756.) An officer may conduct a pat-down search only if he has a reasonable belief that he is dealing with an armed and dangerous individual and that his safety or the safety of others is in danger. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Brown* (1989), 190 Ill. App. 3d 511, 546 N.E.2d 95.) The officers made no such claim here. Accordingly, the trial court acted properly in suppressing this evidence.

Turning then to the search of the car, we must determine whether the trial court erred in not quashing the arrest and suppressing the evidence. Such a decision will only be overturned on review if it is

manifestly erroneous. *People v. Rodriguez* (1987), 154 Ill. App. 3d 401, 506 N.E.2d 1064.

A threshold question is whether Sesmas has standing to object to the search. He made no objection at the time the search was conducted. The general rule is that a passenger lacks standing to challenge the search of another's car unless the passenger had a legitimate expectation of privacy in the place searched. (*Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421; *People v. Manikowski* (1989), 186 Ill. App. 3d 1007, 542 N.E.2d 1148.) Here, Sesmas had no reasonable expectation of privacy in the gas tank of the car. Nor would his interests be any stronger than Zamora's and she consented to the search.

Sesmas argues that a passenger does have standing to challenge a search of an automobile if the search was precipitated by an unlawful seizure or stop. (*People v. Manke* (1989), 181 Ill. App. 3d 374, 537 N.E.2d 13.) However, as discussed below, this was not an unlawful seizure or stop. Sesmas thus does not have standing to contest the search, and the trial court was correct in denying Sesmas' motion.

Zamora, as driver of the vehicle, does have standing and we must therefore turn to the lawfulness of the search of the car as it relates to her conviction.

The circumstances here would not justify a nonconsensual, warrantless search. Stopping a car for a minor traffic violation does not by itself justify a search. (*People v. Penny* (1989), 188 Ill. App. 3d 499, 544 N.E.2d 1015.) The officer must reasonably believe that he is confronting a situation more serious than a routine traffic violation. (*People v. Lawrence* (1988), 174 Ill. App. 3d 818, 529 N.E.2d 63.) Such a belief would not be supported on these facts.

But we are not faced with that situation. Zamora signed a consent form which gave the officers permission to search. Therefore, unless the consent was illegally obtained or the search exceeded the scope of the consent, the search was lawful. *People v. Harris* (1990), 199 Ill. App. 3d 1008, 557 N.E.2d 1277.

Defendants agree that the initial stop was proper. They contend, however, that after the warning citation had been issued, it became an unlawful seizure because the police no longer had any basis for detaining them.

As noted, this was a valid stop for a traffic violation. The trooper then requested identification, which is not unreasonable, nor does it constitute a fourth amendment seizure. (*People v. Long* (1983), 99 Ill. 2d 219, 457 N.E.2d 1252.) After the officer had issued the warning citation, he asked Zamora about her arrest history. He also asked her

whether she presently possessed any narcotics or weapons. This type of questioning has been repeatedly upheld as nonintrusive and noncoercive. (See, e.g., *People v. Bolar* (1990), 205 Ill. App. 3d 597, 563 N.E.2d 1225; *People v. Smith* (1984), 124 Ill. App. 3d 914, 464 N.E.2d 1206.) The reasonableness of the duration and scope of the questioning must be determined from the totality of the circumstances. *People v. Jones* (1989), 190 Ill. App. 3d 416, 545 N.E.2d 1332.

Here, the police officer was faced with a situation where defendants were a long way from home and yet there was some confusion as to who owned the car in which they were travelling. Zamora misrepresented her arrest record when questioned by Trooper Lower. The trooper then secured Zamora's consent to search the vehicle. The duration of this exchange was minimal. Any inconvenience to defendants was minor and reasonable. Therefore, defendants' continued detention after the issuance of the warning citation did not amount to an illegal seizure.

The trial judge found that the continued detention was consensual and of reasonable duration. Accordingly, he denied the motion to suppress. The court's decision is not manifestly erroneous. *People v. Murray* (1990), 137 Ill. 2d 382, 560 N.E.2d 309.

■ Alternatively, defendants argue that the consent given by Zamora was ineffective because it was not the product of her free will. Defendants contend that Zamora's unfamiliarity with the English language and her limited education, when combined with the menacing presence of two officers, evidenced the fact that her will was overborne.

It is well established that a party may consent to a search conducted without a warrant and thus eliminate the need for probable cause and a search warrant. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.) *Miranda* warnings need not be given in order to obtain valid consent. (*Smith*, 124 Ill. App. 3d at 921, 464 N.E.2d at 1211.) Moreover, ignorance of knowledge of the right to refuse to consent does not vitiate the voluntariness of the consent but is merely a factor to consider. (*Smith*, 124 Ill. App. 3d at 920, 464 N.E.2d at 1211.) The State bears the burden of proving by a preponderance of the evidence that the consent was freely and voluntarily given. *People v. Guerrieri* (1990), 194 Ill. App. 3d 497, 551 N.E.2d 767.

Here, there is no evidence that Zamora was coerced. None of the officers displayed their weapons. They did not tell her that she had to consent. Quite to the contrary, Trooper Lower testified that he explained the voluntary nature of the consent. The officers did not

threaten to arrest the defendant or to impound the vehicle if consent was refused. (*Cf. People v. DeLisle* (1982), 104 Ill. App. 3d 297, 432 N.E.2d 954 (consent may be involuntary where defendant must choose between consenting and being arrested).) Zamora agreed to allow the search, exited the car without being ordered to do so, and then handed the keys to the officer. Trooper Lower testified that he explained the voluntary nature of the consent form. Despite her alleged difficulty with the English language, Zamora was able to read at trial from the form, which stated in part:

"I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.

I further state that no promises have been made, nor have any threats, force, or physical or mental coercion of any kind whatsoever been used against me to cause me to consent to the search described above or to sign this form."

Looking at this evidence, we find that it was not unreasonable for the trial judge to have found that Zamora adequately understood the situation and that her will was not overborne.

■ Furthermore, the scope of the search was proper. The standard for measuring the scope of a suspect's consent under the fourth amendment is that of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect. *Florida v. Jimeno* (1991), 500 U.S. ___, 114 L. Ed. 2d 297, 111 S. Ct. 1801.

Here, the consent form specifically granted the officers authority to search "any part, compartment, enclosure, or trunk of the vehicle and the contents of any object or container found therein." In addition, the use of a trained narcotics dog has repeatedly been held to be inoffensive to an individual's rights. (See, *e.g., People v. Campbell* (1977), 67 Ill. 2d 308, 367 N.E.2d 949.) The fact that the vehicle was moved from the highway to another location is of no significance. A car which could properly have been searched on a highway can be searched as well without a warrant at a police station or garage. (*Manikowski*, 186 Ill. App. 3d at 1012, 542 N.E.2d at 1152.) Such a move does not constitute a second search but merely a continuation of the first consensual search. (*Manikowski*, 186 Ill. App. 3d at 1012, 542 N.E.2d at 1152.) In *Manikowski*, a move was occasioned by the approach of bad weather. The move was occasioned in this case by the development of fog which made any further roadside search hazardous. Therefore, the situation presented here is of one, albeit interrupted, consensual search which we find was reasonable under the circumstances.

■ Defendants' next contention is that the trial court erred when it determined the credibility of the arresting officer's version of his conduct during the arrest based on the trial court's personal observation of the officer in court on other occasions.

In denying the motion to quash arrest and suppress evidence, the trial court stated:

"And finally an important consideration that no one would ever know from reading the record. And that is the fact that Trooper Lower in his testimony has indicated to the Court by his demeanor and manner while testifying that his approach to this entire incident and to every stop that he makes, he has testified before me before. That under such circumstances that he is very courteous, polite, easy going, certainly not abrasive, threatening or intimidating in any manner. Whenever he does testify he displays a sense of humor and demeanor that I'm sure his communications with defendants stopped by him is such that they do not feel that they're being pressured or intimidated into consenting to a search."

Generally, a judge's experience and observations are not judicially noticeable facts capable of immediate substantiation by easily accessible sources of indisputable accuracy. (*People v. Walker* (1988), 119 Ill. 2d 465, 519 N.E.2d 890.) A police officer's testimony is to be given the same weight and credibility as the testimony of any other witness. *People v. Rogers* (1988), 172 Ill. App. 3d 471, 526 N.E.2d 655.

The court acted improperly by mentioning Lower's prior testimony as a basis for his credibility. However, any error here is harmless. In ruling on the issue during the post-trial motion, the judge stated that even disregarding the prior conduct of Trooper Lower, the outcome would have been the same. These comments do not warrant a reopening of the suppression hearing or a new trial.

Defendants next argue that the State failed to prove beyond a reasonable doubt that defendants had knowledge and possession of the drugs. They argue that the evidence is insufficient to show that they were even aware that the gas tank contained the drugs.

When presented with a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

■ Defendants were convicted of possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1989, ch. 56½, par. 1401) and controlled substance trafficking (Ill. Rev. Stat. 1989, ch. 56½,

par. 1401.1). Knowledge is a key element in each of these crimes. Conviction for possession with intent to deliver requires that the defendant knowingly possessed the narcotics. Conviction for trafficking requires that the defendant knowingly brought or caused to be brought the controlled substance into this State for the purpose of its delivery or manufacture.

The element of knowledge is seldom susceptible to direct proof. It may, however, be proven by evidence of acts, declarations or conduct of the accused from which the inference may be drawn that he knew of the existence of the drugs at the place they were found. *People v. Alexander* (1990), 202 Ill. App. 3d 20, 559 N.E.2d 567.

The same is true of possession. Where drugs are found in an area under the defendant's control, an inference arises that the defendant had knowledge and control of the narcotics, absent other facts and circumstances which might leave a reasonable doubt as to the defendant's guilt. (*People v. Wiley* (1988), 174 Ill. App. 3d 444, 528 N.E.2d 26.) When drugs are found in a car, it is control of the vehicle rather than ownership which is pertinent to proof of control of the area where the drugs are found. *People v. Whalen* (1986), 145 Ill. App. 3d 125, 495 N.E.2d 122.

Knowledge and control of narcotics are questions of fact for determination by the trier of fact, and its decision will not be disturbed unless the evidence is so palpably contrary to the verdict, or so unreasonable, improbable or unsatisfactory, as to create a reasonable doubt of guilt. *People v. Rouser* (1990), 199 Ill. App. 3d 1062, 557 N.E.2d 928.

Turning then to the facts of the instant case, we find the the trial court's findings are supported by the evidence. Defendants were in a borrowed car on a cross-country trip. The gas tank's greatly reduced capacity would cause the defendants to stop frequently to refuel. When asked who owned the car, defendants gave conflicting answers. Zamora lied to the trooper about her prior arrests. She then denied having a gun, despite her later admission that there was a loaded automatic pistol in her purse on the front seat of the car. A pager belonging to Sesmas was also found in Zamora's purse. The money found in Sesmas' luggage was wrapped in baggies, which is not normally the way people carry money, but is not unknown in the drug trade. The trial court also chose to disbelieve defendants' story about travelling to Chicago to visit a sick uncle whom Sesmas had not seen in 10 years and whose phone number and address were unknown to the defendant.

When viewing the evidence in the light most favorable to the prosecution, we find that it is sufficient to support a finding of knowledge and possession. Additionally, although defendants do not raise the issue, we note that the evidence was sufficient to also prove the intent element of the offense. The large amount of drugs, coupled with its purity, gives rise to a reasonable inference that it was not for personal use. (*People v. Tovar* (1988), 169 Ill. App. 3d 986, 523 N.E.2d 1178.) We therefore find that the State did prove the elements of the offense beyond a reasonable doubt.

Defendants' final contention is that the controlled substance trafficking statute is unconstitutional. They argue that it violates due process and that the minimum sentence is disproportionately excessive.

■ The controlled substance trafficking statute prohibits people from bringing narcotics into Illinois for the purpose of manufacture or delivery. (Ill. Rev. Stat. 1989, ch. 56½, par. 1401.1(a).) The penalty for a violation of this section is no less than twice the minimum and no more than twice the maximum authorized for manufacture or delivery. (Ill. Rev. Stat. 1989, ch. 56½, par. 1401.1(b).) Both defendants were sentenced to 30 years' imprisonment under the trafficking statute. Ill. Rev. Stat. 1989, ch. 56½, pars. 1401(a)(2)(D), 1401.1 (15-year minimum doubled for interstate trafficking).

Penalty provisions bear a presumption of constitutionally. The legislature, under the State's police power, has wide discretion to prescribe penalties for defined offenses. (*People v. Upton* (1986), 114 Ill. 2d 362, 500 N.E.2d 943.) Legislation will survive a due process challenge so long as it is reasonably designed to remedy the evils the legislature has determined to be a threat to the public health, safety and general welfare. *Upton*, 114 Ill. 2d at 373, 500 N.E.2d at 948.

The Generally Assembly, in enacting this statute, set out a lengthy section entitled "Legislative intent." (Ill. Rev. Stat. 1989, ch. 56½, par. 1100.) Defendants focus on language contained therein that the "occasional petty distributor" is not to be punished with the same severity as large-scale traffickers. Given their lack of a prior record, defendants argue that they are, at worst, occasional petty distributors.

The facts, however, do not support their contention. Defendants were convicted of possessing three kilograms of almost pure cocaine having a street value of $1,120,166. While defendants' acts may qualify as occasional, the amount can hardly be described as petty. Indeed, because it is over 900 grams, it falls into the category of the highest amount of drugs statutorily recognized. Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)(D).

We therefore reject defendants' contention that the legislature should have differentiated between dealers and deliverers or that the penalty should be lower for first-time offenders.

The legislature's specific intent was to deter the abuse of controlled substances and to penalize most heavily the traffickers. The statute which doubles the penalties in cases when the substance is brought in from out of State is reasonably designed to remedy that evil. The controlled substance trafficking act is not violative of due process.

Nor does it provide for disproportionately excessive sentences. Absent a clear violation of a constitutional limitation, as where the penalty under the statute is so disproportionate to the offense that it is cruel or degrading or shocks the moral sense of the community, we will not interfere with the legislature's determination of the character and extent of the penalty for the crime. *People v. Castro* (1987), 151 Ill. App. 3d 664, 503 N.E.2d 376.

In addressing similar claims, the United States Supreme Court recently upheld a Michigan law which mandated life in prison without parole for possession of more than 650 grams of cocaine. *Harmelin v. Michigan* (1991), 501 U.S. ___, 115 L. Ed. 2d 836, 111 S. Ct. 2680.

We find it reasonable for the legislature to determine that interstate drug traffickers should be penalized more severely than intrastate traffickers. The punishment provided for in the act is proportionate to the offense and is therefore constitutional.

Accordingly, we affirm the judgment of the Bureau County circuit court.

Affirmed.

BARRY, P.J., and McCUSKEY, J., concur.