Docket No. 84919–Agenda 15–September 1998.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. 

 JOHN GONZALEZ, Appellant.

Opinion filed December 3, 1998.

JUSTICE McMORROW delivered the opinion of the court:

The central issue presented in this appeal is whether, upon legally stopping a vehicle for a traffic violation, it is reasonable for a police officer to immediately instruct a passenger to remain at the stopped car when that passenger, of his own volition, exits the vehicle at the outset of the stop. We also consider whether it was appropriate, in this case, for the officer to conduct a pat-down search of defendant John Gonzalez when defendant indicated that he had a weapon on his person. With one justice dissenting, the appellate court affirmed the circuit court of denial of defendant's motion to suppress. 294 Ill. App. 3d 205. For the reasons that follow, we affirm the judgment of the appellate court.

BACKGROUND

Defendant's conviction stems from an incident which occurred during the early morning hours on October 27, 1994. Defendant, who had a prior felony conviction, was a passenger in a car stopped for a traffic violation. After the car was stopped, defendant exited the vehicle and was proceeding to leave the scene. The police officer ordered defendant to remain at the scene. Defendant returned, was searched, and was found in possession of a handgun and four rounds of ammunition. Prior to trial, defendant filed a motion to suppress the handgun, alleging that the gun was recovered as a product of an illegal search and seizure. The trial court conducted a hearing on defendant's suppression motion, during which the following evidence was presented.

Officer Kevin Gulley, a Rockford Police Department canine officer, testified that on October 27, 1994, at approximately 2:40 a.m., he was seated in his marked K-9 police car on a Rockford side street. Gulley described the location of his patrol as a high-

crime area which generates frequent calls concerning drug activity and shots being fired, with the number of calls escalating in the very early morning hours. The officer testified that as he was seated in his squad car, he observed a vehicle pass which, based upon his experience, he estimated was traveling 40 miles per hour in a 30 mile-per-hour zone. Gulley observed a white female driving the speeding vehicle, but did not notice any other passengers in the car. Gulley testified he activated his emergency lights, effectuated a traffic stop of the vehicle, and directed his spot light at the vehicle's rear view mirror. As Officer Gulley was exiting his squad car, defendant “abruptly” exited from the rear passenger seat of the stopped vehicle. Gulley testified that he immediately ordered defendant to stop and return to the vehicle because the officer “didn't know what [defendant] was planning on doing.” Because defendant ignored Gulley's command and continued to walk away, the officer instructed his police dog to exit the squad car and stand in the “heel” position next to Gulley, at which point the dog began “barking his head off.” Officer Gulley repeated his instruction to defendant to stop and return to the vehicle. After this second command, defendant, who Officer Gulley estimated had walked six to seven feet away from the vehicle, stopped, turned around, and looked at the officer. After hesitating a few seconds, defendant walked back to the stopped vehicle. Gulley testified that from the time defendant exited the stopped vehicle to the time he returned to the car, approximately 30 seconds had passed. Because of defendant's “strange behavior,” Gulley asked defendant whether he was carrying any guns, needles or knives, to which defendant replied “yes.” Officer Gulley then patted defendant down for weapons, and discovered the gun inside the front waist area of defendant's pants. During cross-

examination, Officer Gulley acknowledged that he did not include an account of his conversation with defendant in his police report; instead, Gulley wrote in his report that he “conducted a check of [defendant's] person for weapons due to his strange behavior.”

When asked why he instructed defendant to return to the vehicle, Officer Gulley stated that defendant “exited the vehicle so abruptly I wasn't sure what he was going to do. I didn't know him at that time or who else was in the vehicle. And I still hadn't completed my traffic stop, so just for my safety, I requested that he return to the vehicle.” During cross-examination, in response to the question of whether he feared for his personal safety when defendant exited the stopped vehicle and walked away from the scene, Gulley replied that “[d]ue to the fact that I still had a *** traffic stop to conduct, yes, I did.” Although Officer Gulley testified that based upon his experience defendant displayed “strange behavior,” Gulley acknowledged during cross-

examination that up until the point defendant was instructed to return to the stopped vehicle, defendant had not engaged in a violation of the criminal laws, there was nothing that Gulley observed that indicated that defendant was committing or had committed a crime, and he observed nothing in defendant's hands as he turned around to return to the stopped vehicle.

Rebecca Sigala, the front-seat passenger in the car, testified that she, defendant, and the car's driver, Jessie Hogan, were returning from an evening out, and Hogan was dropping defendant off at his home. According to Sigala, Hogan had pulled over to the curb in front of defendant's home, defendant said good-bye, and exited the vehicle. Sigala testified that defendant had not gone more than a few feet when a police car pulled up behind them, the officer exited the car, and then said to defendant, “Hey, come here.” The witness stated that defendant appeared surprised that the officer was calling to him, immediately walked over to the officer, and engaged the officer in a conversation, at which time the police dog began to bark. Sigala testified that when the police car pulled up behind them, neither its emergency lights nor its spotlight were activated, although the officer did turn on the spotlight immediately before he called to defendant, and the car's emergency lights were activated when defendant was placed in handcuffs. According to Sigala, when backup officers arrived at the scene, she commented to the officers that she did not know why Officer Gulley had pulled up behind them. Sigala testified that an unidentified officer replied that Officer Gulley had radioed that he recognized defendant when the vehicle first passed him and that Gulley intended to pull the car over to investigate.

Jessie Hogan testified that she had spent the evening with defendant and Sigala, and was driving defendant home. Hogan testified that on the way to defendant's residence, she noticed a police car parked on a side street. According to Hogan, this caused her to look down at her speedometer and she saw that she was traveling the speed limit. Hogan then stopped the car by the curb, defendant said good-bye, and he exited the vehicle. Hogan testified that almost immediately after defendant left the car, another car pulled up behind them. Hogan recognized the car as a police vehicle because she saw a light bar across the top, although the emergency lights were not activated at that time. According to Hogan, the officer activated the spotlight, ordered defendant to “come here,” and defendant immediately went over to the officer to speak with him. Because the emergency lights of the police vehicle were not activated, Hogan believed that the officer was concerned only with defendant and that it was not a traffic stop. However, as Hogan started to pull away, the officer whistled her to stop, and she was subsequently issued a ticket for a speeding violation. According to Hogan, the police car's emergency lights were activated only after defendant was taken into custody. On cross-examination, however, Hogan stated that she was aware that a police car was following them before she stopped the vehicle. Hogan additionally testified on cross-examination that defendant was also aware that a police car was behind them before they stopped, as defendant looked back through the vehicle's rear window.

At the conclusion of the hearing, the trial court determined that Officer Gulley's testimony was more credible than that of Sigala and Hogan, and denied defendant's motion to suppress. Based upon the version of events described by Officer Gulley, the trial court judge found that “if an officer effectuates a legal traffic stop for a violation of the law, [then] he has the right to insist the occupants in the car remain in the car, and that's not what the defendant did.” The trial court judge further held that, under the circumstances of the traffic stop, it was not unconstitutional for Officer Gulley to inquire of defendant whether he was carrying any weapons, and when defendant answered affirmatively, it was not unconstitutional for Officer Gulley to perform the pat-down search which revealed the weapon.

At trial, the testimony of Officer Gulley, Sigala, and Hogan was substantially similar to the testimony each provided at the hearing on the suppression motion. Defendant testified on his own behalf and admitted that he had prior convictions for robbery and aggravated discharge of a firearm. Defendant related that as Hogan was driving him home, they saw a police car parked on a side street. When Hogan pulled to the curb in front of defendant's residence, defendant said good-bye and exited the vehicle. It was at this point that defendant saw a police car approach and park behind Hogan's vehicle. According to defendant, the police car's emergency lights were not activated at this time. The officer shined his spotlight into Hogan's car and defendant heard someone say “come here.” Defendant testified that he turned towards the officer and went directly back to him. According to defendant, when he met Officer Gulley in front of the police car, Gulley asked defendant where he lived and what he was doing. Defendant stated that Gulley then asked defendant for identification, and when defendant hesitated, he ordered defendant to place his hands on the hood of the police car, pulled defendant's wallet out of defendant's pants pocket, threw it on the car's hood, and instructed defendant to take out his identification. After ordering defendant to sit on the police car's hood, Officer Gulley took the police dog from the car and directed the dog to sit on the ground near defendant. According to defendant, Gulley proceeded to search the area around Hogan's car and recovered a handgun from the leaf-

covered curb. Although defendant denied that the gun was his, Officer Gulley placed defendant in handcuffs, radioed for assistance, and activated the police car's emergency lights. According to defendant, Officer Gulley never inquired whether defendant had any needles, guns or knives in his possession at the time of the stop.

Upon hearing all of the evidence, a jury convicted defendant of unlawful use of a weapon by a felon (720 ILCS 5/24–1.1(a) (West 1994)), and defendant was sentenced to nine years' imprisonment. On appeal, defendant challenged the trial court's denial of the suppression motion. A majority of the appellate court affirmed the ruling of the trial court.

The appellate court majority noted that under the United States Supreme Court's recent decision in 
Maryland v. Wilson
, 519 U.S. 408, 137 L. Ed. 2d 41, 117 S. Ct. 882 (1997), in instances where a police officer has lawfully stopped a motor vehicle pursuant to a traffic stop, the officer may, as a matter of course, order the driver and passengers out of the vehicle. 294 Ill. App. 3d at 211. Applying the rationale of 
Wilson
 to the matter at bar, the majority determined that “[i]t would be illogical to grant an officer the right to order a passenger out of the vehicle, but not to allow the officer to have control over the passenger's movement during the duration of the traffic stop *** [therefore, the] interest in officer safety presents a compelling justification to permit the officer to have control over the movement of all occupants of a legally stopped vehicle.” 294 Ill. App. 3d at 211-12. Balancing this interest against an individual's interest in personal liberty, the majority concluded that requiring a passenger to remain at the scene of a traffic stop posed a 
de minimis
 intrusion on the passenger's liberty interests, outweighed by the public interest in officer safety. The majority therefore held that under the circumstances it was permissible for Officer Gulley to order defendant to remain at the stopped vehicle: the stop was conducted in a high-crime area; defendant abruptly exited the vehicle and the officer was unsure what defendant was going to do; and the officer did not know who defendant was or who else was in the car. Because Officer Gulley believed his personal safety was in danger, it was appropriate for him to detain defendant at the scene. 294 Ill. App. 3d at 213. For these same reasons, the majority determined that it was not improper for Officer Gulley to ask defendant whether he was carrying any guns, needles or knives, and that based upon defendant's affirmative response, the officer was justified in subjecting defendant to a limited search for weapons. 294 Ill. App. 3d at 213.

In dissent, Justice Bowman wrote that because defendant exited the vehicle of his own volition and was walking away from Officer Gulley, the instant cause was factually distinguishable from 
Wilson
. Based upon Gulley's testimony that he did not observe anything suspicious in defendant's hands or anything that indicated defendant had committed or was about to commit a crime, the dissenting justice determined that no threat was posed to the officer's safety, and that, therefore, any intrusion on defendant's freedom was not 
de minimis
. The dissenting justice also found that because the record did not support Officer's Gulley's statement that he feared for his safety, the officer was not justified in questioning and searching defendant. 294 Ill. App. 3d at 216-17 (Bowman, J., dissenting).

We granted defendant leave to appeal. 166 Ill. 2d R. 315.

ANALYSIS

As a general rule, a trial court's ruling on a motion to suppress evidence will not be disturbed unless it is manifestly erroneous. 
People v. Dilworth
, 169 Ill. 2d 195, 201 (1996). This deferential standard of review applies where the suppression motion turns upon findings of fact, and is grounded in the reality that the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony. See 
People v. Reid
, 136 Ill. 2d 27, 61 (1990).

In the cause at bar, after hearing the testimony and observing the demeanor of the witnesses during the hearing on defendant's suppression motion, the trial court determined that Officer Gulley's testimony was more credible than that of Sigala and Hogan. Upon review of the record, we agree with the appellate court that the trial court's determination concerning witness credibility was “neither clearly erroneous nor against the manifest weight of the evidence.” 294 Ill. App. 3d at 209. Accordingly, we conduct 
de novo
 review of defendant's legal challenge under Officer Gulley's version of events. See 
Dilworth
, 169 Ill. 2d at 201. Defendant contends that even “deferring to the trier of fact and accepting Officer Gulley's testimony as true regarding the events as they unfolded,” this court must nevertheless find that, as a matter of law, defendant's constitutional rights under the fourth amendment of the United States Constitution were violated, in that he was unconstitutionally seized as a result of Officer Gulley's immediate command to remain at the stopped vehicle. We disagree.

The Fourth Amendment to the United States Constitution guarantees the “right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const., amend. IV. Because “the Fourth Amendment protects people, not places” (
Katz v. United States
, 389 U.S. 347, 351, 19 L. Ed. 2d 576, 582, 88 S. Ct. 507, 511 (1967)), “wherever an individual may harbor a reasonable `expectation of privacy' [citation], he is entitled to be free from unreasonable government intrusion.” 
Terry v. Ohio
, 392 U.S. 1, 9, 20 L. Ed. 2d 889, 899, 88 S.Ct. 1868, 1873 (1968). Accordingly, the parameters of this right are shaped by the context in which the right is asserted, for “what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.” 
Elkins v. United States
, 364 U.S. 206, 222, 4 L. Ed. 2d 1669, 1680, 80 S. Ct. 1437, 1446 (1960).

It follows that in evaluating claims under the fourth amendment, the “touchstone of our analysis *** is always `the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' ” 
Pennsylvania v. Mimms
, 434 U.S. 106, 108-09, 54 L. Ed. 2d 331, 335, 98 S.Ct. 330, 332 (1977), quoting 
Terry
, 392 U.S. at 19, 20 L. Ed. 2d at 904, 88 S. Ct. at 1878-79; see also 
People v. Galvin
, 127 Ill. 2d 153, 173 (1989). “Reasonableness,” in turn, depends “ `on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' ” 
Mimms
, 434 U.S. at 109, 54 L. Ed. 2d at 336, 98 S. Ct. at 332, quoting 
United States v. Brignoni-Ponce
, 422 U.S. 873, 878, 45 L. Ed. 2d 607, 614-15, 95 S. Ct. 2574, 2579 (1975).

Our central inquiry in this case is whether defendant was unreasonably seized when defendant, a passenger in a vehicle lawfully stopped for a traffic violation, abruptly exited that vehicle at the outset of the stop and was immediately ordered by Officer Gulley to remain at the car. As a preliminary matter, we note that the stop of the vehicle in which defendant was a passenger was valid, based upon Officer Gulley's observation of a traffic violation. See 
People v. Stewart
, 242 Ill. App. 3d 599, 604 (1993); 
People v. Sesmas
, 227 Ill. App. 3d 1040, 1045 (1992).

For over two decades it has been well established that following a lawful traffic stop, police may, as a matter of course, order the driver out of the vehicle pending completion of the stop without violating the protections of the fourth amendment. 
Pennsylvania v. Mimms
, 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977). Recently, this bright-line rule has been extended to the passengers of legally stopped vehicles. 
Maryland v. Wilson
, 519 U.S. 408, 137 L. Ed. 2d 41, 117 S. Ct. 882 (1997). We must determine whether the rationale of 
Mimms
 and 
Wilson
 allows an officer to control the movement of occupants of a legally stopped vehicle by immediately ordering them to remain at the car.

In 
Pennsylvania v. Mimms
, 434 U.S. 106, 54 L. Ed. 2d 331, 98 S.Ct. 330 (1977), the driver of a vehicle had been stopped for driving with an expired license plate, and the officer requested that he step out of the car and produce his owner's card and operator's license. When Mimms complied, the officer noticed a bulge in his jacket which proved to be a .38-caliber revolver, and Mimms was arrested for carrying a concealed deadly weapon. Mimms filed a motion to suppress the revolver, alleging that the officer's ordering him out of the car constituted an unreasonable seizure. In assessing the reasonableness of the officer's order to the driver to exit the vehicle, the United States Supreme Court weighed the public interest in officer safety against the individual's right to freedom from arbitrary police interference. 
Mimms
, 434 U.S. at 109, 54 L. Ed. 2d at 336, 98 S. Ct. at 332.

On the public interest side of the balance, the Court observed that the State had conceded that there had been nothing unusual or suspicious to justify ordering Mimms out of the car; instead, it was the officer's routine practice to order all drivers out of their vehicles as a precautionary measure to protect the officer's safety. 
Mimms
, 434 U.S. at 109-10, 54 L. Ed. 2d at 336, 98 S. Ct. at 332-

33. Citing to statistics indicating the high level of shootings of police officers associated with traffic encounters, the court thought it “too plain for argument” that the interest in officer safety was “both legitimate and weighty.” 
Mimms
, 434 U.S. at 110, 54 L. Ed. 2d at 336, 98 S. Ct. at 333. The Court determined that it was “ `unreasonable to require that police officers take unnecessary risks in the performance of their duties' ” (
Mimms
, 434 U.S. at 110, 54 L. Ed. 2d at 336, 98 S. Ct. at 333, quoting 
Terry
, 392 U.S. at 23, 20 L. Ed. 2d at 907, 88 S. Ct. at 1881), and pointedly observed that there exists an “inordinate risk confronting an officer as he approaches a person seated in an automobile” (
Mimms
, 434 U.S. at 110, 54 L. Ed. 2d at 336, 98 S. Ct. at 333).

On the personal liberty side of the balance, the Court considered the intrusion into the driver's liberty occasioned by the officer's ordering him out of the car. Noting that the driver's car was already validly stopped for a traffic violation, the Court held that the additional intrusion of asking the driver to step outside his car was “
de minimis
.” 
Mimms
, 434 U.S. at 111, 54 L. Ed. 2d at 337, 98 S. Ct. at 333. The Court observed that “[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.” 
Mimms
, 434 U.S. at 111, 54 L. Ed. 2d at 337, 98 S. Ct. at 333. Accordingly, the Court concluded that “once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures.” 
Mimms
, 434 at 111 n.6, 54 L. Ed. 2d at 337 n.6, 98 S. Ct. at 333 n.6.

In 
Maryland v. Wilson
, 519 U.S. 408, 137 L. Ed. 2d 41, 117 S. Ct. 882 (1997), the Court extended the 
per se
 rule of 
Mimms
 to passengers, holding that a police officer conducting a valid traffic stop may, as a matter of course, order a passenger out of the car, even where the officer has no suspicion that the passenger has been involved in a crime. In 
Wilson
, the officer stopped a vehicle for speeding and failure to display a license tag, and noticed that both the driver and passenger appeared extremely nervous. The officer ordered the passenger out of the vehicle; as he exited, a bag containing crack cocaine fell to the ground and he was arrested. 
Wilson
, 519 U.S. at 410-11, 137 L. Ed. 2d at 45, 117 S. Ct. at 884. The passenger moved to suppress the evidence, arguing that the officer's command to exit the vehicle was an unreasonable seizure in violation of the fourth amendment. 
Wilson
, 519 U.S. at 411, 137 L. Ed. 2d at 45-46, 117 S. Ct. at 884.

Using the same balancing test formulated in 
Mimms
, the Supreme Court found that in considering the public interest, “the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger *** [due to the fact that] traffic stops may be dangerous encounters.” 
Wilson
, 519 U.S. at 413, 137 L. Ed. 2d at 47, 117 S.Ct. at 885. In support of this conclusion, the Court cited to statistics indicating the grave dangers posed to law enforcement officers conducting traffic stops, noting the high number of officer assaults and killings that occurred during these encounters. 
Wilson
, 519 U.S. at 413 n.2, 137 L. Ed. 2d at 47 n.2, 117 S. Ct. at 885 n.2. The Court determined that the possible sources of harm to officers is increased by the presence of passengers in the stopped vehicle. 
Wilson
, 519 U.S. at 413, 137 L. Ed. 2d at 47, 117 S. Ct. at 886.

With regard to personal liberty, the Court determined that a traffic violation does not afford probable cause to stop a passenger, as it does for the driver. 
Wilson
, 519 U.S. at 413, 137 L. Ed. 2d at 47, 117 S. Ct. at 886. However, “as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle ***[and] [t]he only change in their circumstances *** is that they will be outside of, rather than inside of, the stopped car.” 
Wilson
, 519 U.S. at 413-14, 137 L. Ed. 2d at 47, 117 S. Ct. at 886.

After balancing these interests, the Court held that “an officer making a traffic stop may order passengers to get out of the car pending completion of the stop,” as “danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car, *** [and] the additional intrusion on the passenger is minimal.” 
Wilson
, 519 U.S. at 414-

15, 137 L. Ed.2d at 48, 117 S.Ct. at 886.

 In his brief to this court, defendant contends that 
Wilson
 does not apply to the cause at bar for two reasons. First, defendant argues that because “Officer Gulley had not exerted control over [defendant's] movements before he left the car,” and because defendant's “status as a passenger ended under his own control,” defendant was thereby “due the same consideration as any citizen simply walking down the street of his community when Gulley happened upon him.” We do not find defendant's arguments persuasive. Contrary to defendant's contentions, once Officer Gulley effectuated the traffic stop, defendant, as a passenger of that lawfully stopped vehicle, was thereby also stopped. 
Wilson
, 519 U.S. at 413-14, 137 L. Ed. 2d at 47, 117 S.Ct. at 886. Defendant's attempt to analogize his situation to that of an individual simply walking down the street is unavailing.

Second, defendant contends that 
Wilson
 is inapplicable to the instant cause because the 
Wilson
 Court specifically declined to consider whether “an officer may forcibly detain a passenger for the entire duration of the stop.” (
Wilson
, 519 U.S. at 415 n.3, 137 L. Ed. 2d at 48 n.3, 117 S. Ct. at 886 n.3.) According to defendant, because the matter at bar presents the precise issue which was reserved by the 
Wilson
 Court, we should likewise decline to apply the 
Wilson
 rationale to the cause at bar. We find defendant's argument on this point to be without merit. Neither was defendant subjected to a lengthy detention based upon the lawful stopping of the car, nor did defendant inquire of Officer Gulley whether he could leave the scene of the traffic stop. To the contrary, when defendant abruptly exited from the stopped vehicle, Officer Gulley immediately ordered defendant to return to the car, whereupon defendant was subsequently frisked and then placed under arrest on the basis of the discovery of the firearm on his person. Therefore, as in 
Wilson
, the question concerning detention of a passenger for the entire duration of the stop is not presented in this case, and we express no opinion upon it.

It is clear under the rationale of 
Mimms
 and 
Wilson
 that the movements of occupants of a vehicle which is legitimately stopped may be subject to control by the police officer conducting the stop, even though the officer has no suspicion that the individuals have been involved in criminal behavior. This rule is dictated by the public's strong interest in officer safety during potentially dangerous traffic stops when balanced against the minimal intrusion on the privacy interests of the driver and passengers.

Thus, consistent with the rationale of 
Mimms
 and 
Wilson
, we conclude in the cause at bar that, because the public interest in officer safety outweighs the potential intrusion to the passenger's liberty interests, it is reasonable for a police officer to immediately instruct a passenger to remain at the car, when that passenger, of his own volition, exits the lawfully stopped vehicle at the outset of the stop. We find that because the same risk of harm to officers discussed in 
Mimms
 and 
Wilson
 is present where a passenger unexpectedly exits a lawfully stopped vehicle, the officer's need to exercise “ `unquestioned command of the situation' ” is likewise present. See 
Wilson
, 519 U.S. at 414, 137 L. Ed. 2d at 48, 117 S. Ct. at 886, quoting 
Michigan v. Summers
, 452 U.S. 692, 702-03, 69 L. Ed. 2d 340, 350, 101 S. Ct. 2587, 2594 (1981).

Other courts have reached similar results, determining that pursuant to the bright-line rules of 
Mimms
 and 
Wilson
, an officer possesses the authority to control, in various ways, the movements of passengers during traffic stops. For example, in a case factually similar to the cause at bar, the court in 
Washington v. Mendez
, 88 Wash. App. 785, 947 P.2d 256 (1997), 
rev. grant.
 135 Wash. 2d 1016, ___ P.2d ___ (1998), determined that a police officer did not violate the fourth amendment by ordering a passenger to return to a vehicle stopped for a traffic violation. In 
Mendez
, the defendant immediately exited the stopped vehicle, and the approaching officer, pursuant to departmental policy, twice ordered the defendant to get back into the car. Instead of following the officer's instructions, the defendant began to walk, and then run, away. In holding that the police lawfully ordered the defendant to return to the stopped vehicle, the court observed that:

“as noted in 
Wilson
, passengers at routine traffic stops present some danger to the police. This danger increases when the police cannot exercise reasonable control over their location by requiring them either to remain in the car or exit the car. We conclude the benefit of increased police protection outweighs the intrusion to passengers.” 
Mendez
, 88 Wash. App. at 792, 947 P.2d at 260.

Our appellate court in 
People v. Boyd
, No. 4–98–0077 (September 18, 1998) recently held that 
Wilson
 permits an officer to order a passenger to remain in a lawfully stopped vehicle. The court observed that an officer's order to remain in the vehicle “differs only slightly” from an order to exit the vehicle, and “[t]o hold otherwise could lead to anomalous results *** [as] we believe it would be illogical to allow a police officer to order a passenger out of a lawfully stopped vehicle, but not to allow the officer to order such a passenger to remain in the vehicle.” Similarly, in 
Kinberg v. District of Columbia
, No. 94–2516 (D.C. January 5, 1998) (unpublished), the court held that pursuant to 
Wilson
, “it is reasonable and appropriate police procedure to take steps to control the movements of individuals during a traffic stop *** [and a] police officer has the power to reasonably control the situation by requiring a passenger to remain in a vehicle during a traffic stop, particularly where *** the officer is alone and feels threatened.” See also 
United States v. Moorefield
, 111 F.3d 10, 12 (3d Cir. 1997) (pursuant to 
Wilson
, officer validly ordered a passenger to remain in the car with his hands held in the air while the traffic stop was being conducted; the “minimal” intrusion on the passenger's liberty was far outweighed by “the benefit of added officer protection”); 
Harris v. Commonwealth
, 27 Va. App. 554, 500 S.E.2d 257 (1998) (rationale underpinning 
Wilson
 supports detention of passengers beside an automobile until the completion of a lawful traffic stop); 
Carter v. State
, 229 Ga. App. 417, 494 S.E.2d 108 (1997) (
Wilson
 authorizes officers to order passengers to remain in lawfully stopped vehicles).

Thus, our ruling today is in accordance with the trend of decisions that, based upon the rationale of 
Mimms
 and 
Wilson
, it is reasonable for a police officer to control the movements of individuals during a traffic stop. Because “[w]e cannot allow the officer's safety to depend on how fast the driver and passenger can get out of the vehicle after it has been stopped,” we find that ordering occupants to remain at the lawfully stopped vehicle “does no more than establish the status quo at the time of the stop.” 
Arizona v. Webster
, 170 Ariz. 372, 374, 824 P.2d 768, 770 (App. 1991). We therefore reject defendant's contention that Officer Gulley's command to defendant to return to the car was an unreasonable seizure within the meaning of the fourth amendment.

There remains the question of the propriety of the search of defendant's person which resulted in the discovery of the gun after defendant returned to the automobile. We emphasize that neither 
Mimms
 nor 
Wilson
 provides automatic justification for the search of an occupant in a vehicle lawfully stopped for a traffic violation. Because the question of whether a law enforcement officer may conduct a pat-down for weapons is a separate inquiry from that of the legality of the initial stop (
People v. Galvin
, 127 Ill. 2d 153, 163 (1989)), we must apply traditional fourth amendment analysis to review the propriety of the search. Again, the “ `touchstone of our analysis *** is always “the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security” ' ” (
Terry
, 392 U.S. at 19, 20 L. Ed. 2d at 904, 88 S.Ct. at 1878-79; see also 
People v. Galvin
, 127 Ill. 2d 153, 173 (1989)), and each case must “stand or fall on its own set of concrete facts.” 
Galvin
, 127 Ill. 2d at 174.

Our analysis of this question is governed by the principles set forth in 
Terry v. Ohio
, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S.Ct. 1868 (1968), as “the usual traffic stop is *** analogous to a so-called `
Terry stop
.' ” 
Berkemer v. McCarty
, 468 U.S. 420, 439, 82 L. Ed. 2d 317, 334, 104 S. Ct. 3138, 3150 (1984). In 
Terry
, the Court held that an officer was justified in conducting a limited search for weapons, commonly referred to as a “frisk,” once he had reasonably concluded that the person whom he had legitimately stopped posed a threat to the safety of himself or others. 
Terry
, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883; 
People v. Flowers
, 179 Ill. 2d 257, 264 (1997). The 
Terry
 Court observed that, under such limited circumstances, it would “be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.” 
Terry
, 392 U.S. at 24, 20 L. Ed. 2d at 907-08, 88 S. Ct. at 1881. Accordingly, because “[t]he sole justification of the search *** is the protection of the police officer and others nearby,” this search “must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer.” 
Terry
, 392 U.S. at 29, 20 L. Ed. 2d at 911, 88 S. Ct. at 1884. The Supreme Court has extended the 
Terry
 principles to situations involving traffic stops in order to minimize the dangers faced by law enforcement officers during these encounters. See, 
e.g.
 
Michigan v. Long
, 463 U.S. 1032, 1047-52, 77 L. Ed. 2d 1201, 1218-22, 103 S. Ct. 3469, 3480-82 (1983); 
Mimms
, 434 U.S. at 111-12, 54 L. Ed. 2d at 337-38, 98 S.Ct. at 334.

The validity of a frisk conducted during a valid stop is assessed by using an objective standard. 
Terry
, 392 U.S. at 21-22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880; 
Flowers
, 179 Ill. 2d at 264. Thus, “in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant” a belief that his safety or that of others is in danger. 
Terry
, 392 U.S. at 21, 27, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880, 1883. These facts need not meet probable cause standards, but must constitute more than a mere hunch. 
Flowers
, 179 Ill. 2d at 264. Although the validity of a frisk is assessed pursuant to an objective standard, the officer's subjective belief regarding the safety of the situation is one of the factors that may be considered within the totality of the circumstances known to the officer at the time of the frisk. 
Flowers
, 179 Ill. 2d at 264. Indeed, this court has previously held that “[i]n determining the reasonableness of the officer's conduct, the facts must be considered not from the perspective of analytical hindsight, but rather as they would have been viewed by a reasonable officer confronting them in the performance of his duties.” 
People v. Smithers
, 83 Ill. 2d 430, 439 (1980).

We find that, based upon the facts available to Officer Gulley at the time of the search, it was not unreasonable for him to inquire of defendant whether he was carrying any guns, needles or knives, and upon receiving an affirmative response, frisking defendant to uncover such weapon. We note that although defendant contends that Officer Gulley could not properly pose the question concerning defendant's possession of weapons without first providing defendant with 
Miranda
 warnings (
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), prearrest roadside questioning pursuant to a routine traffic stop does not require warnings pursuant to 
Miranda
 because, under such circumstances, an individual is not subject to “custodial” interrogation. 
Berkemer
, 468 U.S. at 438-39, 82 L. Ed. 2d at 333-

34, 104 S. Ct. at 3149-50; see also 
People v. Patterson
, 146 Ill. 2d 445, 451-52 (1992). Furthermore, 
Miranda
 warnings are not required prior to general on-the-scene questioning as to facts surrounding that scene. 
People v. Parks
, 48 Ill. 2d 232, 237 (1971); 
People v. Laspisa
, 243 Ill. App. 3d 777, 783 (1993).

 We believe that facts in this case would “ `warrant a man of reasonable caution in the belief' that the action taken was appropriate.” 
Terry
, 392 U.S. at 21-22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880. 
Terry
 does not require that an officer be absolutely certain that the individual is armed; rather, the determinative issue is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others is in danger. 
Terry
, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883; 
Galvin
, 127 Ill. 2d at 165. We agree with the appellate court that the “circumstances of the instant case were sufficient to create a reasonable suspicion that the defendant was armed and a threat to Officer Gulley's personal safety.” 294 Ill. App. 3d at 213. As was observed in 
Terry
, “it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.” 
Terry
, 392 U.S. at 23, 20 L. Ed. 2d at 907, 88 S. Ct. at 1881. Accordingly, Officer Gulley was justified in “act[ing] quickly to maintain the status quo, rather than to observe the situation further.” 
People v. McGowan
, 69 Ill. 2d 73, 78 (1977). Thus, we determine that the gun was not discovered as a result of an unreasonable search, and therefore hold that defendant's motion to dismiss was properly denied.

For the foregoing reasons, the judgment of the appellate court is affirmed.

Affirmed
.

JUSTICE HEIPLE, dissenting:

Defendant was a passenger in a car that was stopped for a minor traffic violation.
(footnote: 1) When the driver stopped, defendant left the car and started to walk home. Without any reason to believe defendant was committing or had committed a crime, the police officer forcibly detained defendant at the scene and searched him, finding a gun. The majority opinion holds that a passenger of a motor vehicle stopped for a traffic violation may be detained by police without any suspicion either that the passenger had committed a crime or that he posed any articulable danger to the safety of the police officer.
(footnote: 2) This ruling not only invites routine and arbitrary searches and seizures of honest law-abiding citizens, it also eviscerates the protections against unreasonable searches and seizures in both the Illinois and federal constitutions. Ill. Const. 1970, art. I, §6; U.S. Const., amend. IV. Therefore, I respectfully dissent.

The fundamental purpose of the fourth amendment is to safeguard the privacy and security of individuals against arbitrary invasions by government officials. 
People v. Dilworth
, 169 Ill. 2d 195, 201 (1996), citing 
Camara v. Municipal Court
, 387 U.S. 523, 528, 18 L. Ed. 2d 930, 935, 87 S. Ct. 1727, 1730 (1967). At the heart of the protections afforded by the fourth amendment is the requirement of individualized suspicion. Even in cases where obtaining a warrant based on probable cause is impractical, the police must have knowledge of sufficient facts “to create a reasonable suspicion that the person in question has committed, or is about to commit, a crime.” 
People v. Smithers
, 83 Ill. 2d 430, 434 (1980); 
People v. Scott
, 148 Ill. 2d 479, 503 (1992); 
People v. Flowers
, 179 Ill. 2d 257, 262-63 (1997). A showing of individualized suspicion is constitutionally required except in the rare case where the privacy interest implicated by the search or seizure is minimal and an important government interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion. 
King v. Ryan
, 153 Ill. 2d 449, 458 (1992), quoting 
Skinner v. Railway Labor Executives' Ass'n
, 489 U.S. 602, 624, 103 L. Ed. 2d 639, 664, 109 S. Ct. 1402, 1417 (1989). The majority's abandonment of the individualized suspicion standard in this case is wholly unwarranted.

The majority gratuitously asserts that the intrusion on the passenger's liberty is minimal because the car in which the passenger is travelling has already been stopped. In so ruling, however, the majority trivializes the liberty interest at stake in this case. The only encounter many citizens of this state will ever have with the police will be a routine traffic stop. Allowing police officers to arbitrarily detain passengers in vehicles stopped for traffic violations without any reason to believe the passenger has committed a crime or threatens the safety of the police officer ensures that this encounter will be “annoying, frightening, and perhaps a humiliating experience.” 
Terry v. Ohio
, 392 U.S. 1, 24-

25, 20 L. Ed. 2d 889, 908, 88 S. Ct. 1868, 1882. The “thousands upon thousands of petty indignities” legitimized by the majority opinion will have a substantial impact on the liberty and freedom of the citizens of this state. See 
Maryland v. Wilson
, 519 U.S. 408, 419, 137 L. Ed. 2d 41, 51, 117 S. Ct. 882, 888 (1997) (Stevens, J., dissenting, joined by Kennedy, J.).

Maryland v. Wilson
 does not control the result in this case. In fact, the 
Wilson
 court explicitly declined to address the issue presented in this case. See 
Wilson
, 519 U.S. at 415 n.3, 137 L. Ed. 2d at 48 n.3, 117 S. Ct. at 886 n.3. The majority asserts this case does not present the issue left open in 
Wilson
 because defendant was not subjected to a lengthy detention and the defendant passenger did not ask the police officer whether he could leave the scene of the traffic stop. Slip op. at 12. The length of defendant's detention, however, is simply not relevant here. The critical inquiry in this case is whether the police officer had a sufficient basis for detaining defendant in the first place. The majority's insistence that defendant needed to ask the police officer if he could leave is astonishing and indicative of a police state mentality. The right to be free from unreasonable searches and seizures is one of our most precious constitutional rights. The exercise of this right does not depend on the grace of law enforcement officials. This opinion trashes the protections of the fourth amendment. See 
Terry
, 392 U.S. at 22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880 (1968) (noting fourth amendment protections, if left to good faith of police officers, would “evaporate”).

The majority fails to articulate any reason why a police officer would be safer if a passenger in a vehicle stopped for a traffic violation is detained at the scene rather than allowed to walk away. A police officer must have a reasonable suspicion that a passenger in a vehicle stopped for a traffic violation has committed or is about to commit a crime. This standard is more than sufficient to protect officer safety. “It does no disservice to police officers *** to insist upon exercise of reasoned judgment.” 
Wilson
, 519 U.S. at 423, 137 L. Ed. 2d at 53, 117 S. Ct. at 891 (Kennedy, J., dissenting).

Finally, it must be noted that the majority opinion looks only to the fourth amendment in the federal constitution. Although defendant has not argued that the evidence in this case should be suppressed under the provision against unreasonable searches and seizures found in the Illinois Constitution, we are free to look to these protections as well. Ill. Const. 1970, art. I, §6. “This court unquestionably has the authority to interpret provisions of our state constitution more broadly than the United States Supreme Court interprets similar provisions of the federal constitution.” 
People v. Krueger
, 175 Ill. 2d 60, 74 (1996).

In 
In re May 1991 Will County Grand Jury
, 152 Ill. 2d 381 (1992), this court unanimously pronounced that the provision against unreasonable searches and seizures in the Illinois Constitution “goes beyond Federal constitutional guarantees by expressly recognizing a zone of personal privacy.” 
In re May 1991 Will County Grand Jury
, 152 Ill. 2d at 391. 
In re May 1991 Will County Grand Jury
 is particularly instructive in this case because it demonstrates that this court is unwilling to abandon the individualized suspicion requirement even in cases where such a result is authorized under federal constitutional law. See 
In re May 1991 Will County Grand Jury
, 152 Ill. 2d at 389-93 (holding Illinois Constitution requires a showing of individualized suspicion before a grand jury can subpoena evidence of a noninvasive physical nature even though such a showing is not required under federal constitution). Thus, Illinois constitutional law provides an even more compelling basis for invalidating the search and seizure in this case. Those who cherish their right to be free from arbitrary invasions of privacy can only hope that a more enlightened court in a future case will restore our citizens' constitutional rights which this court has today taken away.

JUSTICES HARRISON and NICKELS join in this dissent.

FOOTNOTES
1:     
The car was traveling 40 miles per hour in a 30-mile-per-

hour zone.

2:     
Although the majority also holds that the police officer's search of defendant was legal, this argument fails if the initial seizure of defendant was illegal. See 
People v. Wardlow
, 183 Ill. 2d 306, 317 (1998) (weapon discovered after illegal 
Terry
 stop must be suppressed as product of unconstitutional seizure of person).