[728 NYS2d 64]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FAR-QUAN FORBES, Also Known as MICHAEL FORBES, Appellant.

Second Department, July 2, 2001

**APPEARANCES OF COUNSEL**

*Lynn W. L. Fahey,* New York City (*David P. Greenberg* of counsel), for appellant.

*William L. Murphy, District Attorney* of Richmond County, Staten Island (*Jonathan J. Silbermann* and *Gary R. DeFilipo* of counsel), for respondent.

**OPINION OF THE COURT**

FEUERSTEIN, J.

On this appeal we are called upon to determine whether the police, pursuant to a lawful traffic stop, may constitutionally require the driver of the vehicle and all passengers to remain in the vehicle until the traffic stop is concluded. We hold that, upon weighing the minimal degree of the intrusion upon the passengers' liberty against the significant safety concerns of the investigating officers, it is permissible to require the passengers to remain in the stopped vehicle.

**I**

On September 25, 1999, Police Officer Raymond Pepitone and Sergeant Michael Carbonara were patrolling the area of Vanderbilt and Osgood Avenues on Staten Island, which was known to be a locale with an unusually high volume of narcotics-related arrests. At approximately 2:30 A.M., Pepitone observed a gray four-door Nissan Maxima with a clear plastic cover over the license plate and tinted windows, both of which constituted Vehicle and Traffic Law violations. Pepitone and Carbonara decided to stop the vehicle. After the vehicle had pulled over, Pepitone and Carbonara exited the patrol car and approached the Nissan. Pepitone was on the driver's side and Carbonara was on the passenger side. Pepitone asked the driver for his license, registration, and insurance card and informed him of the reason for the stop. Pepitone recognized the driver as a man named "Jackson" who had been arrested a few years earlier. As Pepitone was asking for the driver's information, the defendant, who was in the passenger seat, attempted to exit the vehicle. Carbonara told the defendant to stay in the car until the car stop was over and closed the passenger door for the defendant. The defendant then placed his hands on the dashboard of the car. When asked why he was doing that, the defendant stated that he didn't want to get shot. The officers then took the driver's information and returned to their patrol car to check for suspensions and revocations.

At this point, both officers heard the familiar sound of a semiautomatic handgun being "racked," meaning that the top slide of the gun was pulled back and a round of ammunition pushed

into the chamber. The officers were familiar with this sound because they both carried 9-millimeter handguns and had heard the "racking of the slide" many times before. The sound was so distinctive that both officers looked up simultaneously. The officers, realizing that they could have a dangerous situation at hand, discussed a plan to re-approach the vehicle to frisk the occupants. Pepitone once again approached on the driver's side and Carbonara approached on the passenger side. Just as Carbonara got to the passenger side door, the defendant exited the vehicle. The defendant stated that he wanted to go to the store, and Carbonara said that he could do so only after Carbonara checked him for weapons. The defendant resisted a search of the front of his waistband but as Carbonara grabbed the bottom of the defendant's shirt he saw the butt of a handgun. Carbonara yelled to Pepitone, "He's got a Glock." The defendant then said, "It's not a Glock." Carbonara pushed the defendant away and pulled out his weapon. Pepitone pushed the defendant to the ground and Carbonara retrieved the gun which had fallen down the defendant's pants. The defendant was then placed under arrest. A subsequent search of the Nissan uncovered a 9-millimeter round of ammunition.

The defendant was charged with criminal possession of weapon in the third degree and resisting arrest. He moved to suppress the evidence recovered from him based upon his assertion that Officer Carbonara's refusal to let him leave the scene was a violation of his constitutional rights. The Supreme Court denied suppression, and the defendant pleaded guilty to criminal possession of a weapon in the third degree with specific reservation of his right to appeal the suppression ruling.

## II

The law is settled that upon making a valid stop of a motor vehicle for a traffic violation, the police may order the driver and all passengers out of the vehicle until the stop is concluded (*see, Maryland v Wilson,* 519 US 408; *Pennsylvania v Mimms,* 434 US 106; *People v Robinson,* 74 NY2d 773, 774, *cert denied* 493 US 966; *New York v Class,* 475 US 106, 115 [out of a concern for safety, "officers may, consistent with the Fourth Amendment, exercise their discretion to require a driver who commits a traffic violation to exit the vehicle even though they lack any particularized reason for believing the driver possesses a weapon"]). This is based upon the conclusion that the

legitimate safety concerns of the officers conducting the traffic stop outweigh the de minimis intrusion to the passengers' liberty (*see, Maryland v Wilson, supra,* at 412). Both the United States Supreme Court and the New York Court of Appeals have recognized the potentially dangerous situation police officers encounter in conducting traffic stops and that the danger is increased by the presence of more than one occupant of the vehicle (*see, Maryland v Wilson, supra,* at 413; *People v Robinson, supra,* at 775). Further, the Supreme Court has noted that "[t]he risk of harm to both police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation" (*Maryland v Wilson, supra,* at 414, *quoting Michigan v Summers,* 452 US 692, 702-703).

While the United States Supreme Court and the Court of Appeals have not addressed the precise issue presented here, whether officers can force a passenger to remain in a lawfully stopped vehicle until the investigation is concluded, other courts have addressed the issue with varying conclusions. One line of cases holds that the reasoning of *Maryland v Wilson* (*supra*) applies equally to officers requiring a passenger to remain in the lawfully stopped vehicle as it does to requiring a passenger to exit a lawfully stopped vehicle (*see, People v Castellon,* 76 Cal App 4th 1369, 1375, 91 Cal Rptr 2d 204, 208 ["(I)t was for the officer to decide whether his safety was better preserved by ordering (the defendant) to stay inside the car or by ordering him out of the vehicle"]; *People v Gonzalez,* 184 Ill 2d 402, 704 NE2d 375, *cert denied* 528 US 825; *Rogala v District of Columbia,* 161 F3d 44; *United States v Moorefield,* 111 F3d 10; *State v Webster,* 170 Ariz 372, 824 P2d 768). The other line of cases holds that it is unconstitutional for the police to detain a passenger unless there is some independent reasonable suspicion that the passenger is dangerous or is involved in criminal activity (*see, Castle v State,* 999 P2d 169 [Alaska]; *State v Mendez,* 137 Wash 2d 208, 970 P2d 722; *Wilson v State,* 734 So 2d 1107 [Fla], *cert denied* 529 US 1124).

### III

We choose to follow the line of cases which hold that it is within the discretion of the police officers on the scene to decide whether it is safer to have the driver and passengers exit the vehicle or whether it is safer to maintain the status quo by requiring the driver and passengers to remain in the vehicle until the traffic stop is over. The contention that it is more intrusive to individual liberty to require a passenger to stay in

the vehicle which he or she had just been voluntarily occupying prior to the stop is supported neither by specific reference nor common sense. Indeed, it is more intrusive to force the passengers to leave the vehicle, which no one contends is unconstitutional. Even assuming that requiring passengers to stay in a vehicle is more intrusive than requiring them to exit it, such intrusion cannot outweigh the significant safety concerns for the police officers conducting the lawful stop. As aptly stated by the Court of Appeals of Arizona, "[t]o hold otherwise could well lead to the unnecessary death of an officer, gunned down by those walking away who suddenly turn and fire or who circle behind the officer, either assaulting or killing him while he is talking to the driver" (*State v Webster, supra*, 170 Ariz, at 374, 824 P2d, at 770). The abridgement of the discretion of a police officer to control the scene in a way that maximizes the safety of the officer and the vehicle's passengers could result in unnecessary tragedies. Moreover, allowing passengers to leave a vehicle could result in lost witnesses and place an absconding passenger in jeopardy from passing vehicles. At most, the intrusion to the passenger is a mere inconvenience for a brief period of time. In contrast, the risk to the life of the police officer and others is enormous.

That risk was present here. Pepitone and Carbonara were patrolling a high crime area in the early morning hours. The driver of the vehicle was someone Pepitone recognized as having been arrested before. Further, one of the traffic infractions forming the basis for the stop was improperly tinted windows. It is reasonable to assume that the officers could not have known how many other passengers were in the vehicle. It is not difficult to imagine the potentially volatile situation that could occur if several passengers were allowed to exit the vehicle at will, particularly considering that in many cases routine traffic stops are conducted by a lone officer. The defendant proposes a rule which could lead to increasing the already dangerous conditions facing police officers on a daily basis.

The defendant's reliance upon *People v Robbins* (83 NY2d 928), *People v Campbell* (245 AD2d 191), *People v Antelmi* (196 AD2d 658), and *People v Greene* (135 AD2d 449) is misplaced. In those cases, it was the detention combined with a search of the defendant's person without any suspicion of wrongdoing that was found unconstitutional. In *Campbell* and *Robbins*, the only event that prompted the search of the defendant was his attempted flight from the scene, conduct which carries no indicia of criminality. In *Antelmi* and *Greene*, the search was

based upon nothing more than the initial stop and the attempt to leave. Here, there was no search until the officers heard the distinctive sound of a 9-millimeter handgun being "racked." This uncontroverted evidence provided a sufficient reasonable suspicion that either the driver or the defendant had a weapon, thereby warranting the subsequent search.

Accordingly, the Supreme Court properly denied that branch of the defendant's omnibus motion which was to suppress physical evidence, and the judgment is affirmed.

RITTER, J. P., KRAUSMAN and S. MILLER, JJ., concur.

Ordered that the judgment is affirmed.