Fabricant, Judith, J.

INTRODUCTION

The defendants face firearms and drug charges arising from a series of events that began with a traffic violation. Before the Court are the defendant’s motions to suppress evidence and statements.[1] For the reasons that will be explained, the motions will be allowed.

FINDINGS OF FACT

After an evidentiary hearing, the Court finds the following facts. On May 9, 2005, at approximately 3:00 p.m., Trooper Scott Flaherty finished a paid detail at a construction site on Route 495 in Wrentham, and traveled to the Massachusetts Highway Department (MHD) office on Route 1 to fill out paperwork. As he was about to leave the parking lot of the MHD office and enter Route 1 heading north, he saw a car pass with no front license plate. He was aware that, although it is lawful to drive with one plate if the Registry of Motor Vehicles has issued only one, the practice of the Registry over the last fifteen years has been to issue two plates, and that where two plates are issued a driver is required to display both. See G.L.c. 90, §6. He pulled onto Route 1 behind the car, intending to stop it, just in time to see the car make an abrupt left turn across the double yellow line and across two lanes of southbound traffic moving at highway speed, such that cars traveling southbound had to brake to avoid a collision. He followed the car visually, seeing it enter the parking lot of the Arbor Inn on the other side of Route 1, and park in a parking space.
Flaherty activated his blue lights and, after waiting some time for a break in traffic, crossed the road and turned into the same parking lot. He stopped his cruiser directly behind the car in such a manner as to block its exit. As he started to get out of his cruiser, he saw that there were three white men in the car, and that each was opening his door and beginning to exit. He yelled at the three to stay in the car. He then approached the driver’s door, which was open. As he did so, beginning when he got about even with the trunk of the car, he smelled an odor of burned marijuana coming from the interior of the car. As he conversed with the driver, defendant Peter Cardin, he noticed that Cardin was sweating profusely, despite cool weather, that he appeared nervous, that he did not make eye contact, and that he stuttered. All three men kept trying to get out of the car; Flaherty repeatedly ordered them to stay in.
Flaherty asked Cardin for his license and registration, and asked where he was coming from. Cardin answered that he was coming from Brockton, had picked up the other two, and was giving them a ride. After obtaining identification from Cardin, Flaherty went around to the passenger side, where defendant Charles Schifone was in the front seat, and defendant Michael O’Connor was in the back, and asked them for identification. Schifone said he had no identification. He gave his name as Carl Sinawsky, with a date of birth in April 1981. He, too, appeared nervous, pale, and sweaty, and did not make eye contact.
O’Connor gave his name as Richard Ervin, with a date of birth of June 4, 1979. Flaherty asked a series of questions designed to test that information, including his mother’s name, the date of his last arrest, and his age. O’Connor gave his age as twenty-four. Flaherty confronted him with the inconsistency between that answer and his claimed date of birth. O’Connor then gave his true name, and said that there might be a warrant out for him. Hearing that, Flaherty took O’Connor to the rear of his cruiser and pat-frisked him. As he did so, Schifone got out of the car and ran northward on Route 1.
Flaherty responded by handcuffing both O’Connor and Cardin, and asking them why Schifone ran, and whether there was anything in the car he should be concerned about. O’Connor responded that there might be a gun in the car. Flaherty called for back-up, which arrived shortly. He placed both Cardin and *94 O’Connor in cruisers, and then searched the car. On the back seat, on the passenger side, where O’Connor had been sitting, he found a black plastic case, closed but unlocked, marked “Glock.” He opened the case and found a Glock handgun with a magazine clip attached. Later examination determined that the gun was loaded with fifteen rounds of ammunition. Flaherty also found a police baton in the car. Flaherty asked Cardin and O’Connor if there were any more weapons; both responded that they were unsure whether Schifone had more. Flaherty read the Miranda warnings to Cardin and O’Connor from a card, and then both were transported to the Foxborough State Police barracks. Meanwhile, police searched for Schifone, using a helicopter, canine, and other resources, without success.
At the barracks, Flaherty conducted the booking procedure, including again reading the Miranda warnings to both defendants from a card. Each of them was given a Miranda form to read and sign. The form sets forth the warnings in full, and then asks two questions, with “yes” and “no” available to circle in answer to each; “Do you understand the rights I have read to you?” and “Do you wish to talk to us now?” Cardin circled “yes” to the first, and did not circle any answer to the second. O’Connor circled “yes” to the first, and “no” to the second. Both appeared shaken, and were quiet, but did not appear to be under the influence of any substance, or otherwise impaired.
O’Connor was placed in a cell, while Lieutenant McCarthy interviewed Cardin in the booking area. In response to questions, Cardin denied knowing the other two and knowing about the gun. McCarthy terminated the interview, and let Cardin make a telephone call to his mother, during which he was overheard to say that she had better hire a good lawyer because there was a gun involved and he was in trouble. Some time later, McCarthy again interviewed Cardin. This time he acknowledged knowing the other two, and said that they had traded the gun for drugs. McCarthy also made further effort to interview O’Connor; the only statement he succeeded in eliciting relevant to the case was that O’Connor had known the man who ran since age thirteen.
Over the next two days, Flaherty did some investigation, including making inquiries of confidential informants, and determined that the person who had run from him was Schifone, and that he was staying in room 18 at the Arbor Inn. He learned that Schifone had outstanding warrants. He applied for and obtained an arrest warrant on the charge of unlawful possession of a firearm. On May 11, 2005, at about 8:30 or 9:00 p.m., Flaherty and several other troopers went to the Arbor Inn. They met with the manager and obtained a key to room 18, along with the name of the person to whom room 18 had been rented; that person had listed an address in Milford. Flaherty and others then went to the front door of room 18, while Trooper Robert Bohn went to the back and assumed a position in sight of the rear window of the room.
At the front door, Flaherty could see lights and a television on. He knocked and yelled “Massachusetts State Police,” without response. At the back, Trooper Bohn saw the window open and a male arm, clad in a T-shirt, reach out and throw two objects, one of which was white and wrapped in clear plastic. Bohn spoke to Flaherty by radio, telling him that “he’s throwing drugs out the window.” Bohn drew his gun and yelled to the person inside “show me your hands.” Bohn and Trooper Baker recovered the two objects: one was a plastic bag containing white powder, later determined to be eleven grams of cocaine; the other contained marijuana.
Upon hearing Bohn’s radio report, Flaherty and his companions at the front door tried to enter the room with the key, without success. They then broke the door open, entered with guns drawn, and found two people, Schifone and a woman. The woman screamed “Charlie, who are these people.” She calmed down upon learning that they were police. The troopers handcuffed both and directed them to sit on the floor. Flaherty read the Miranda warnings to them from a card. Schifone was asked whether there were guns in the room; he said no. With the two on the floor, the troopers searched the motel room, finding various items consistent with drug distribution, including a scale, baggies, and items Flaherty perceived to be in the nature of burglaiy tools. The search included opening the few drawers and other enclosed areas that existed in the room, and lifting the mattress to look underneath. The credible evidence presented at the hearing was not sufficient to provide a basis for precise determination of where each item was found.[2]
At the scene Schifone seemed scared and surprised, but not under the influence of any substance or otherwise impaired. He made a comment to the effect that he kept thinking about a trooper whom he had “pissed off’ a couple of days before by running. In response to questions from Flaherty at the scene, he said that he sells just enough drugs to pay for his own habit.
Schifone was transported to the Foxborough State Police barracks, where Flaherty conducted the booking procedure.[3] In response to questions, Schifone denied ownership of the gun, but acknowledged selling drugs to support his habit. At some point — the evidence does not indicate whether in response to a question or not — he made a statement to the effect that the police would not find his fingerprints on the gun.

DISCUSSION

1. The Initial Seizure
Trooper Flaherty did not actually stop the vehicle; it was already stopped, and parked, when he parked behind it. In parking behind it, however, he blocked its path, and thereby seized the car and its driver, Cardin. See Commonwealth v. Helme, 399 Mass. 298, 300 (1987) (seizure occurred when officers parked cruiser so as to *95 block defendant’s car). His doing so was lawful if he had reasonable suspicion that its operator had committed a traffic violation. See Commonwealth v. Williams, 46 Mass.App.Ct. 181, 182 (1999), quoting Commonwealth v. Bacon, 381 Mass. 642, 644 (1980). He had such reasonable suspicion, based on having observed the vehicle being operated without a front license plate. Operation of the vehicle in that condition was unlawful if the Registry had issued two plates for the vehicle. See G.L.c. 90,§6.[4] Although Flaherty could not know for certain that it had, he could reasonably so believe, given his awareness that the practice of the Registry over the last fifteen years has been to issue two plates. That reasonable belief was sufficient to justify stopping the vehicle. The abrupt left turn, requiring on-coming traffic to brake, was a second violation, providing additional justification for a seizure. See G.L.c. 89, §8.[5]
2. The Order to Stay in the Car
Under Massachusetts law, justification to seize a car and driver, based on a traffic violation, does not, in itself, justify seizure of passengers.[6] Rather, an officer may seize passengers only where the facts provide either a reasonable safety concern or reasonable suspicion that the passengers are involved in criminal activity. See Commonwealth v. Torres, 433 Mass. 669, 670-72 (2001); Commonwealth v. Gonsalves, 429 Mass. 658, 662-63 (1999); Commonwealth v. King, 389 Mass. 233, 243 (1983).
These cases hold that an order to a passenger to exit a vehicle is a seizure of the passenger. No Massachusetts decision directly addresses whether an order to passengers to stay in the car requires the same justification, but no reason appears that it should not, as such an order imposes similar restraint on the passenger’s liberty.[7] See Commonwealth v. Smigliarto, 427 Mass. 490, 491 (1996) (“A seizure takes place ‘within the meaning of the Fourth Amendment to the United States Constitution ... and art. 14 of the Massachusetts Declaration of Rights ‘if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave’ ”), quoting Commonwealth v. Borges, 395 Mass. 788, 791 (1985). In ordering all three occupants to stay in the car, Flaherty intruded on the liberty of all three, and thereby seized the passengers as well as the driver. That order was justified as to the passengers only if supported by facts warranting reasonable concern for safety or reasonable suspicion of criminal activity by the passengers.
At the time he ordered the passengers to stay in the car, Flaherty had a reasonable basis to believe that the driver had committed two traffic violations, but had no information whatever regarding the passengers. The traffic violations did not implicate them, and nothing else Flaherty had observed up to that point provided any basis to suspect any criminal activity. See Torres, 424 Mass. at 157, 159 (“passenger ... in the absence of his own misbehavior or suspicious conduct, could expect that the formalities involved in the traffic stop would take place solely between the driver and the trooper”; passenger’s attempt to exit vehicle did not provide basis for suspicion); Commonwealth v. Wilson, 52 Mass.App.Ct. 411, 413 (2001) (“pursuit of a vehicle for a traffic violation does not constitute, without more, pursuit of a passenger”).
In regard to safety, the Court must determine “whether a reasonably prudent man in the policeman’s position would be warranted in the belief that the safety of the police or that of other persons was in danger.” Commonwealth v. Santana, 420 Mass. 205, 212-13 (1995), quoting Commonwealth v. Silva, 366 Mass. 402, 406 (1974). To establish such a belief as reasonable, “the Commonwealth is not required to make the specific showing that a driver or passenger has a weapon.” Commonwealth v. Stampley, 437 Mass. 323, 326 (2002). “(T]he officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger . . .” Id. “While a mere hunch is not enough ... it does not take much for a police officer to establish a reasonable basis to justify” protective measures. Gonsalves, 429 Mass. at 664.
From what Flaherty knew at the time he ordered the three to stay in the car, the only fact that might raise a safety concern was that Flaherty was outnumbered three to one. Cases have recognized that numbers have considerable significance for safety. See, e.g., Commonwealth v. Feyenord, 62 Mass.App.Ct. 200, 206 (2004) (noting safety concerns where officer was outnumbered two to one), aff'd, 445 Mass. 72, 76 (2005); Commonwealth v. Torres, 433 Mass. 669, 675 (2001) (noting safety concerns where officer was outnumbered five to one); see also Commonwealth v. Holley, 52 Mass.App.Ct. 659, 665 (2001) (“This was not a situation where the police were outnumbered by the occupants of a vehicle and therefore could take reasonable precautions . . .”).
The Court is unaware of any case, however, that has accepted numbers alone as sufficient to justify a seizure of passengers during a traffic stop, in the absence of anything to indicate a threat. Indeed, if such were the rule, the doctrine established in Gonsalves and its progeny would have little application, since officers regularly make traffic stops alone, and therefore are usually outnumbered when a passenger is present. The Court therefore concludes that the order to the passengers to stay in the car was unlawful, so that any evidence resulting from that order must be suppressed.

3. The Results of the niegality

On the facts as they actually occurred, all evidence of the crimes charged against all three defendants resulted from the unlawful seizure of the passengers. Flaherty’s inquiry of O’Connor led to his falsehoods regarding his identity, which then led to his admission to outstanding warrants. That led to his removal from the car and pat-frisk, during which Schifone ran. *96 Schifone’s flight transformed the incident from a traffic stop to a criminal investigation; Flaherty questioned the other two, leading O’Connor to reveal the presence of the gun, which Flaherty then found. The gun, along with O’Connor’s outstanding warrants, led to the arrest of Cardin and O’Connor, giving occasion for their custodial statements. Schifone’s flight also stimulated Flaherty’s investigation of his identity and location, leading to the raid at the motel room, which gave rise to the drug charges against Schifone.
The Commonwealth could nevertheless avoid suppression of evidence by proving inevitable discovery. See Commonwealth v. O’Connor, 406 Mass. 112, 115-17 (1989). The Commonwealth’s burden in that regard is to prove by a preponderance of the evidence not merely that the evidence sought to be suppressed more probably than not would ultimately have been found by lawful means, but that “discovery by lawful means was certain as a practical matter.” Id. at 117. The inquiry requires an essentially hypothetical consideration of what would have occurred without the illegality, but speculation is not appropriate; rather, the Court must engage in a specific and detailed analysis of the facts as found. Id. at 117.
Here, the defendants had parked in the parking lot of the Arbor Inn, and begun to get out of the car as Flaherty approached. It is fair to infer that their intention was to go inside, and that they would have done so if Flaherty had not stopped them. Thus, absent the illegal seizure of the passengers, Flaherty would have approached Cardin alone, and engaged in the routine inquiry attendant on a traffic violation. In the course of obtaining Cardin’s license and registration, he would have come close to the car, even if Cardin had already exited. It thus appears inevitable that Flaherty would have identified the smell of burned marijuana. That smell from a vehicle in a traffic stop establishes probable cause to believe that criminal activity is or has occurred, and therefore justifies search of the vehicle. See Commonwealth v. Kitchings, 40 Mass.App.Ct. 591, 596, and n.8 (1996), and cases cited.
No rule of law, however, nor any police policy known to the Court or established in the evidence, would have required Flaherty to conduct a search. He would have had no reason to search other than the smell, and perhaps Cardin’s apparent nervousness, and no basis to suspect any crime other than possession of marijuana for personal use, hardly a high priority for law enforcement. Flaherty was not asked and did not testify as to whether he would have searched on that basis alone, or whether he has any personal practice in that regard. On the facts presented, it appears probable that he would have done so. Under O'Connor, however, probability is not enough; the Commonwealth must prove that discoveiy was “certain as a practice matter.” 406 Mass, at 117. The Court cannot find that standard met here.
Absent search of the car, Flaherty would not have discovered the gun, and would have had no basis to arrest Cardin, and no reason to conduct any investigation of the other two. Both had outstanding warrants on which they likely would have been arrested at some point, but nothing beyond speculation indicates that Schifone would have been arrested while in possession of the contraband that forms the basis of charges against him. Accordingly, all of the evidence and statements must be suppressed.

CONCLUSION AND ORDER

For the reasons stated, the defendants’ motions to suppress evidence and statements are ALLOWED.

Defendant O’Connor has not filed a written motion to suppress, but at the hearing was permitted to join in the motions filed by the other defendants.

Flaherty testified that the items found were “in plain view,” but his memory of their locations was vague.

Flaherty was not asked about, and did not testify to giving Miranda warnings during booking.

G.L.c. 90, §6 reads, in relevant part, as follows:
Every motor vehicle or trailer registered under this chapter when operated in or on any way in this commonwealth shall have its register number displayed conspicuously thereon . . . one number plate to be attached at the front and one at the rear of said motor vehicle . . . but if the registrar issues but one number plate it shall be attached to the rear of the vehicle so that it shall always be plainly visible.

G.L.c. 89, §8 reads, in relevant part, as follows:
Any operator intending to turn left, in an intersection, across the path or lane of vehicles approaching from the opposite direction shall, before turning, yield the right-of-way until such time as the left turn can be made with reasonable safety.

It does under the Fourth Amendment. See Maryland v. Wilson, 519 U.S. 408, 415 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977).

States that have adopted Mimms-Wilson treat the two orders the same, allowing both based solely on a traffic violation. See, e.g., North Carolina v. Shearin, 612 S.E.2d 371, 377 (2005); New York v. Forbes, 728 N.Y.S.2d 64, 95 (2001); Illinois v. Gonzalez, 704 N.E.2d 375, 382-83 (Ill. 1998), abrogated on other grounds by Illinois v. Sorenson, 752 N.E.2d 1078 (Ill. 2001); Montana v. Roberts, 943 P.2d 1249, 1251 (Mont. 1997); Arizona v. Webster, 824 P.2d 768, 770 (Ariz.Ct.App. 1991). See also Commonwealth v. Gonsalves, 429 Mass, at 672 n.1. (1999) (Fried, J., dissenting) (“the purpose of Mimms and Wilson is not for the courts to decide whether having occupants wait inside or outside the vehicle is safer, rather it is to allow the experienced officer in the field to make this determination in the particular circumstances present”). Other states that, like Massachusetts, have required greater justification under their constitutions than federal law requires have treated exit orders and orders to stay in the car similarly. See, e.g., Washington v. Mendez, 970 P.2d 722, 728 (Wash. 1999). Some cases have held orders to stay in or return to the car unlawful even where exit orders would have been permissible under Mimms-Wilson, viewing orders to stay in or return to the car as a greater intrusion on the passenger’s liberty under the circumstances presented. See, e.g., Wilson v. Florida, 734 So.2d 1107, 1113 (Fla.Dist.Ct.App. 1999); Dennis v. Maryland, 693 A.2d 1150 (Md. 1997). See also New York v. Harrison, 443 N.E.2d 447, 450 (1982) (order to stay in car unlawful absent reasonable suspicion, where no stop of car).