People v Hernandez (2024 NY Slip Op 51518(U))

[*1]

People v Hernandez

2024 NY Slip Op 51518(U)

Decided on November 13, 2024

Supreme Court, Kings County

Daniels-DePeyster, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 13, 2024
Supreme Court, Kings County

The People of the State of New York

against
Elmer Hernandez, Defendant.

Indictiment No. 71485-24

Sarah Alexandra Kaufmann, Esq. of the Legal Aid Society for the defendant 
ADA Kathleen Conlon for Eric Gonzalez, Kings County District Attorney's Office

Claudia Daniels-DePeyster, J.

The defendant, who is charged with Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03(3)) and other related charges, moves to suppress the firearm recovered from the defendant's vehicle and statements allegedly made by the defendant to law enforcement. On September 11, 2024, and September 23, 2024, this Court conducted a combined Dunaway/Ingle/Mapp/Huntley hearing. The People called two witnesses: Police Officer Andrew Lajoie and Police Officer Andrew Guiteau. Additionally, the People introduced three exhibits. The defendant did not present any witnesses but did introduce ten exhibits.
Based upon the testimony at the hearing, the submissions by the parties and the applicable law, the motion to suppress is DENIED in part and GRANTED in part. 
 I. FINDINGS OF FACT
As a preliminary matter, the Court finds that the witnesses were credible.
A. Police Officer Andrew Lajoie
Police Officer Andrew Lajoie has been with the New York City Police Department (hereinafter "NYPD") for approximately three years and is currently assigned to the 67 Precinct Detective Squad (Tr. at 6). Prior to that, he was assigned to patrol in the 72 Precinct, where his responsibilities included "answering various calls of service from members of the public" (Tr. at 6).
On October 4, 2023, Officer Lajoie was in uniform in a marked vehicle with his partner, Police Officer Anthony Lagrutts (Tr. at 7-8). At approximately 1:35 p.m., the officers "responded to a call from another unit in the NYPD" requesting assistance at the intersection of 65th Street between Second and Third Avenue" in Kings County (Tr. at 8, 24, 42). When they arrived, Officer Lajoie "observed multiple other units on scene along with three individuals that were stopped outside of a [gray Honda CRV] vehicle. Two male and one female" (Tr. at 8-9, 24, 65). He later learned the names of those individuals: John Guerra, Karina Mendez, and Elmer Hernandez (Tr. at 9). He identified Elmer Hernandez at the hearing as the defendant (Tr. at 9). On the scene, Officer Lajoie spoke to another officer who advised him that "there was a female complainant adjacent to the vehicle on the sidewalk who had several lacerations and bleeding [*2]about the head" (Tr. at 8, 55, 57). The woman was "sitting on the curb on a stoop of 65th Street" (Tr. at 30). Officer Lajoie did not speak with the complainant on the scene but instead went to Lutheran Medical Center to talk to her (Tr. at 9-10, 28-31, 32, 42). At the hospital, the complainant told Officer Lajoie that "she was a victim of an assault by the three previously mentioned people who were stopped by the other NYPD units, and that her phone was taken during the struggle and that is how she got the lacerations about her head and her body" (Tr. at 10). She also told him that "a week prior" the defendant had "brandished a firearm" at her and that "he was threatening to shoot her or kill her with a firearm" (Tr. at 66).
Officer Lajoie then returned to the 72 Precinct where Guerra, Mendez and the defendant had already been transported (Tr. at 9-10, 33). The CRV had also been removed to the 72 Precinct by Police Officer Malk "for safekeeping purposes" (Tr. at 9-10, 33). At the precinct, Officer Lajoie was to begin "the inventory procedure on the mentioned vehicle" (Tr. at 10-11, 33). Officer Lajoie told the Court that an inventory search was conducted "[t]o remove any items from the vehicle which aren't originally placed there by the manufacturer for the subject to come and retrieve their items after they're released from police custody" (Tr. at 11). He also said that the inventory search guidelines are memorialized in the NYPD Patrol Guide (Tr. at 11-12; People's Exhibit 1 — NYPD Patrol Guide Section 218-13, Issued July 1, 2000). He said the items in the vehicle were "removed and placed into bags, itemized and vouchered" (Tr. at 14; see People's Exhibit 2 — Body Worn Camera Footage of Office Lajoie). They "collected numerous items such as clothing from the vehicle," "a glassine," a purse, and a "zipped up small bag" "underneath the front passenger seat," which contained a loaded "revolver style handgun" (Tr. at 13-14, 16, 35, 37, 39). The Evidence Collection Team (hereinafter "ECT") arrived, processed and vouchered the recovered firearm (Tr. at 14, 39).
When the inventory search was completed, Officer Lajoie proceeded to the arrest processing room of the 72 Precinct to complete the arrest process (Tr. at 17). While doing so, John Guerra and the defendant were in adjacent holding cells approximately 10 feet from Officer Lajoie (Tr. at 10, 17, 41). While in the cell, the defendant was offered food and drink and use of the restroom (Tr. at 17). At some point, Officer Lajoie heard Guerra "begin to yell" (Tr. at 18). The officer "entered into the main holding cell area and tried to see what the matter was," and he "observed John [Guerra] talking to Elmer [the defendant] saying very irately [sic] that he knows that it's not his gun and since he wanted to have a gun with him, then he would have to go and own up to it, and he was saying that to Elmer" (Tr. at 18, 46-47). According to the officer, the defendant said "okay, I understand. I want to go upstairs, and I want to talk to the detectives and tell them that it was my gun" (Tr. at 18). According to Officer Lajoie, he did not threaten the defendant, make any promises, ask any questions, or draw his weapon when this statement was made (Tr. at 19-20).
Officer Lajoie subsequently "set up an interview with the precinct detective squad" and had the defendant sit down with him and Police Officer Salzano for a "custodial interrogation" (Tr. at 20, 47). The defendant was read his Miranda warnings, but he did not want to speak with the officers (Tr. at 20). The defendant "requested the presence of an attorney" and was "brought back down to the 72 Precinct main holding cells" (Tr. at 20, 47).
B. Police Officer Andrew Guiteau
Police Officer Andrew Guiteau has been with the NYPD for ten years and is currently with the Emergency Service K-9 Team, where he is responsible for "respond[ing] to any jobs that would require the services of the deployment of a police dog" (Tr. at 68).
On October 4, 2023, he was in uniform in a marked car with his "dog partner" (Tr. at 69). At approximately 1:35 p.m., he "was driving down 65th Street towards Second Avenue from Third Avenue" in Kings County when he "saw a female in the middle of the street" flagging him down (Tr. at 70-71). The woman "appeared to be bleeding in her face" (Tr. at 71). When Officer Guiteau stopped, the woman "pointed towards a gray SUV and stated that she was assaulted (Tr. at 71). The officer "immediately activated [his] turret lights and attempted to pull over that SUV" (Tr. at 71). "At first, the vehicle drove . . . a couple of car lengths" before stopping (Tr. at 71).[FN1]
Then, the officer "stepped out and engaged with the individuals in the vehicle," telling them "to remain in the vehicle" (Tr. at 71-72). He identified the defendant at the hearing as the individual in the back of the vehicle (Tr. at 72). Officer Guiteau radioed for back up. When asked why, he indicated: "Because I was by myself, and I wanted them to assist me because if they would get out of the car, it would be an issue for me" (Tr. at 72). 
Upon backup arrival, the officer "tried to get the story from the complaining victim," who informed him that "she was assaulted by the individuals in the car" and "slashed with a blade" (Tr. at 72-73, 75). She also stated that "the gentleman had a firearm, had menaced her with a firearm . . . the person in the back seat" (Tr. at 73, 79-81). Subsequently, the individuals in the car were removed and placed under arrest (Tr. at 73).

 II. CONCLUSIONS OF LAW
On a motion to suppress evidence, the prosecution has the initial burden of going forward to demonstrate the legality of the police actions and must introduce credible evidence to meet this burden (People v. Hernandez, 40 AD3d 777 [2d Dept. 2007]; see People v. Berrios, 28 NY2d 361, 369 [1971]). The Court makes the following conclusions of law:

 A. Dunaway/Ingle/Mapp
For the Dunaway/Ingle/Mapp prong of this hearing, the initial burden of proof rests with the People to put forward credible evidence tending to show that law enforcement acted lawfully. The defendant has the burden of proving by a preponderance of the evidence that the police acted unlawfully (see People v. Baldwin, 25 NY2d 66 [1969]; see People v. Parker, 180 AD3d 1072 [2d Dept. 2020]). The Court must determine whether the police action was "justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place" (People v. Wheeler, 2 NY3d 370, 374 [2004]).
To assess the propriety of a street encounter with police, the Court must employ the four-tiered framework outlined in People v. DeBour (40 NY2d 210 [1976]) and reaffirmed in People v. Hollman (79 NY2d 181 [1992]). Each progressive level under this framework "authorizes a separate degree of police interference with the liberty of the person approached and consequently requires escalating suspicion on the part of the investigating officer" (id. at 185). "The justification for each escalation is based on the totality of the circumstances at the moment the escalation occurs, building on the officer's prior observations and actions of both the officer and [*3]the private individual" (People v. Johnson, 40 NY3d 172, 179 [2023]).
Level One — Request for Information: Law enforcement may engage in minimally intrusive questioning to request information "when there is some objective, credible reason for that interference not necessarily indicative of criminality" (DeBour, 40 NY2d at 223). The request for information cannot be based on conduct that is otherwise innocent and "must be predicated on more than a hunch, whim, caprice or idle curiosity" (People v. Ocasio, 85 NY2d 982, 985 [1995]). A level one request for information must be limited to "basic, non-threatening questions" regarding, for example, address, destination, or identity (People v. Kennebrew, 106 AD3d 1107, 1109 [2d Dept. 2013]). An individual does have the right to walk away without responding (see People v. Howard, 50 NY2d 583 [1980]).
Level Two — Common Law Right of Inquiry: Law enforcement is permitted "to gain explanatory information . . . short of forcible seizures" upon a "founded suspicion that criminal activity is afoot" (DeBour, 40 NY2d at 223). A level two intrusion would involve more pointed questions that would reasonably lead the person approached to believe that they are suspected of some wrongdoing (Kennebrew, 106 AD3d at 1109).
Level Three — Reasonable Suspicion: Permits "a forcible stop and detention" but requires the officer to have "a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (DeBour, 40 NY2d at 223). Reasonable suspicion is defined as the "quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand" (People v. Martinez, 80 NY2d 444 [1992], citing People v. Cantor, 36 NY2d 106 [1975]). However, "innocuous behavior alone will not generate a founded suspicion that a crime is at hand" (Kennebrew, 106 AD3d at 1109; see People v. Brannon, 16 NY3d 596, 602[2011] ("reasonable suspicion requires specific and articulable facts which, along with any logical deductions, reasonably prompted the intrusion" [emphasis added])). An effect of this right to temporarily detain is the "authority to frisk if the officer reasonably suspects that [they are] in danger of physical injury by virtue of the detainee being armed" (DeBour, 40 NY2d at 223; see People v. Carney, 58 NY2d 51 [1982] (a police officer with knowledge of facts indicating that the individual is armed or dangerous may frisk a suspect)). 
Level Four — Reasonable Cause: Law enforcement may arrest and take a person into custody when that officer "has reasonable cause to believe that person has committed a crime, or offense in [the officer's] presence" (id.).
i. The Stop
The defendant argues that Officer Guiteau did not have reasonable suspicion to believe that the CRV "occupants had committed, were committing or were about to commit a crime when he seized the vehicle and its occupants" and that a "full-fledged seizure of everyone in the car was not justified by the level of evidence he had when he seized them" (Defense Hearing Submission 1 at 3-4). The defendant also argues that there is nothing in the recording tying the complainant's injuries to the vehicle or its occupants (id. at 4). Specifically, the defendant argues that Officer Guiteau "offered no information about what [the complainant] meant when she gestured to the [CRV]" and that "[i]t was only after detaining them [the occupants of the vehicle] that he [Officer Guiteau] even began to speak to the complainant (id. at 3). The Court disagrees.
This Court finds that this "Level Three" stop by Officer Guiteau was permitted, as he had [*4]"a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (DeBour, 40 NY2d at 223). Immediately upon exiting his vehicle to speak with the bloody woman who flagged him down, Officer Guiteau was directed to the CRV, directly next to his own vehicle, in which the defendant was an occupant (see People v. James, 166 AD3d 1011, 1012 [2d Dept. 2018] ("Generally, a police officer has reasonable suspicion to stop and detain an individual where the individual matches the description of a perpetrator's appearance and is located close to the crime scene, both temporally and geographically"); see also People v. Ingle, 36 NY2d 413, 415 [1975] ("A single automobile traveling on a public highway may be stopped for a 'routine traffic check' when a police officer reasonably suspects a violation of the Vehicle and Traffic Law"); see People v. Perez-Lopez, 29 Misc 3d 1218(A) [Sup. Ct. Bx. Co. 2010] ("[i]nterference with a moving vehicle is a seizure requiring, at a minimum, reasonable suspicion")).
This temporary detention did not "elevate the detention to an arrest under the circumstances" (People v. Tucker, 223 AD2d 424 [1st Dept, 1996]; see People v. Allen, 73 NY2d 378 [1989]). Having reasonable suspicion that the defendant may have engaged in criminal activity, the officer was "justified in directing him to stop for the purpose of conducting a limited investigation" (People v. Morris, 138 AD3d 1239, 1240 [3rd Dept. 2016]; see People v. Ellis, 62 NY2d 393, 396 [1984] ("[t]he police officers, observing a traffic infraction, properly followed and stopped defendant and asked him for his driver's license"); see People v. Forbes, 283 AD2d 92 (2d Dept. 2001) (finding that since a police officer has the right to order a passenger out of a vehicle, under appropriate circumstances, the officer can detain a passenger in a car during a traffic stop); see People v. Garcia, 20 NY3d 317 [2012] ("a police officer may, as a precautionary measure and without particularized suspicion, direct the occupants of a lawfully stopped vehicle to step out of the car")).
Therefore, the motion to suppress the firearm and statement is denied on this basis.
ii. Arrest
The defendant argues that the People failed to establish probable cause to arrest the defendant. First, the defendant argues that "when Mr. Hernandez was ordered out of the Honda CRV and placed in handcuffs, the complainant had not tied him [the defendant] to a specific crime" (Defense Hearing Submission 1 at 6). In support of this argument, the defendant goes into extreme detail in their closing papers using the body-worn camera footage, pointing out specific words the complainant used when speaking with the officers. For example, according to the defendant the complainant "asserts that the female occupant slashed her and the guy, singular, started punching her," that she at no point says, "she was assaulted by the three individuals in the vehicle," that she says, "they have my phone . . . [and] does not elaborate on who they means" (Defense Reply Papers at 3). The Court disagrees.
It is well-settled that information provided by an identified citizen is sufficient in and of itself to provide a police officer with probable cause (see People v. Boykin, 187 AD2d 661 [2d Dept. 1992] ("Because the statement of the complainant, an identified citizen, is assumed to have veracity, the police, based on the complainant's information, had probable cause to arrest the defendant"); see People v. Williams, 301 AD2d 543 [2d Dept. 2003] ("Information provided by an identified citizen accusing another individual of the commission of a specific crime is sufficient to provide the police with probable cause to arrest"); see People v. Read, 74 AD3d [*5]1245 [2d Dept. 2010] (finding probable cause to arrest the defendant without verifying the complainant's accusations first); see People v. James, 166 AD3d 1011, 1012 [2d Dept. 2018] ("Generally, a police officer has reasonable suspicion to stop and detain an individual where the individual matches the description of a perpetrator's appearance and is located close to the crime scene, both temporally and geographically"); see People v. McClain, 67 AD3d [4th Dept. 2009] (information provided by an identified citizen accusing another of a specific crime is sufficient to provide the police with probable cause to arrest)). Here, the complainant was very clear when she told Officer Guiteau that "the guy in the back put a gun to me last week. He got a gun in the back. The n*gga in the back" (see Defense Exhibit A at 6:45). The defendant was the only person sitting in the back of the vehicle. There was no confusion about who the complainant was referring to. Thus, the People have met their burden of demonstrating that the police possessed probable cause to arrest the defendant.
The defendant also argues that "[n]othing in Officer Guiteau's testimony or on his body worn camera suggests he told another officer about this incident from the preceding week," regarding the defendant pointing a gun at the complainant, before placing the defendant under arrest (Defense Hearing Submission 1 at 8).
"Under the fellow officer rule, a police officer can make a lawful arrest even without personal knowledge sufficient to establish probable cause, so long as the officer is acting 'upon the direction of or as a result of communication with' a fellow officer ... in possession of information sufficient to constitute probable cause for the arrest" (People v. Ketcham, 93 NY2d 416, 419 [1999], quoting People v. Mims, 88 NY2d 99, 113[1996]). Probable cause exists when "an officer has knowledge of facts and circumstances sufficient to support a reasonable belief that an offense has been or is being committed" (People v. Maldonado, 86 NY2d 631, 635 [1995] [internal quotation marks omitted]). At a suppression hearing, the prosecution has the burden of establishing that the officer who transmitted the information had probable cause (see Ketcham, supra).
In support of their argument, the defendant points out that when explicitly asked why the defendant "was handcuffed and arrested, Officer Lajoie alleged that, once he was at the hospital, the complainant told him that, a week earlier, Mr. Hernandez brandished a firearm at the complainant, indicating this previous incident was the basis of Mr. Hernandez' arrest, and further conceding that he did not develop this information on the scene" (id. at 9). This argument, however, ignores the fact that the defendant had already been placed under arrest prior to Officer Lajoie arriving on the scene. There would be no need for Officer Lajoie to be given the specifics about the allegations to justify the arrest (see id.; see People's Exhibit 1 — Body-Worn Camera Footage of Officer Lajoie at 1:20).
iii. Impound and Inventory Search
"When the driver of a vehicle is arrested, the police may impound the car and conduct an inventory search, where they act pursuant to reasonable police regulations relating to inventory procedures administered in good faith" (People v. Walker, 20 NY3d 122, 125[2012] internal citations and quotation marks omitted); see People v. Padilla, 21 NY3d 268, 272 [2013] ("[f]ollowing a lawful arrest of a driver of a vehicle that is required to be impounded, the police may conduct an inventory search of the vehicle"); see People v. Noble, 211 AD3d 970). An inventory search is "a search designed to properly catalog the contents of the item searched" [*6](People v. Johnson, 1 NY3d 252, 256 [2003]). The objective of an inventory search is "to protect the property of the defendant, to protect the police against any claim of lost property, and to protect police personnel and others from any dangerous instruments" (People v. Galak, 80 NY2d 715, 719 [1993]; see Florida v. Wells, 495 US 1 [1990]). "The People bear the burden of demonstrating the validity of [an] inventory search" (Padilla, 21 NY3d at 272). When an inventory search of an automobile is challenged, the People must establish that (1) that the vehicle was lawfully impounded, (2) that the search was conducted pursuant to a standardized local police procedure that limits the discretion of the officers in the field, and (3) that the inventory was not conducted as a pretext to search for evidence.
The People bear the threshold burden of demonstrating that the subject vehicle was lawfully impounded at the time of the inventory search, as only a lawfully impounded vehicle may be subject to an inventory search (see People v. Tardi, 28 NY3d 1077 [2016]; see generally 1 Barry Kamins, New York Search & Seizure § 5.05 [2024]). "[T]he decision to impound . . . is properly analyzed as distinct from the decision to inventory" (People v. Rhodes, NYLJ. 4/8/97 [Sup. Ct. Queens Co. 1997] (quoting United States v. Duguay, 93 F3d 346, 351 [7th Cir. 1996]). "The Fourth Amendment's proscription against unreasonable seizures prohibits the police from impounding a car solely because the driver or passenger is arrested" (People v. Miles, 3 Misc 3d 566, 569 [City Ct. Rochester 2003]). The police may impound a vehicle without a warrant "[i]n the interests of public safety and as part of . . . community caretaking functions" (South Dakota v. Opperman, 428 US 364 [1976]).
New York courts have held that police may lawfully impound a car only in carefully circumscribed circumstances. Impoundments are lawful, for example, where there is a reasonable basis to believe that the car itself is evidence of a crime (see, e.g., People v. Boyd, 48 AD3d 1155 [4th Dept. 2008] (holding that impoundment and inventory search of the defendant's van was proper where the victim indicated the involvement of both the defendant and a van, where the defendant was found at a vehicle repair shop where the van was, which was registered to the defendant's wife); see, e.g., People v. Hutson, 270 AD2d 45 [1st Dept. 2000]); where the car was involved in a fatal automobile accident (see, e.g., People v. Quackenbush, 88 NY2d 534 [1996]); where the car is reported or appears to be stolen (see, e.g., People v. Grear, 232 AD2d 578 [2d Dept. 1996]); where a car is abandoned or illegally parked and presents an impediment to traffic (see e.g. People v. Edwards, 163 AD3d 712, 714 [2d Dept. 2018] ("There is no dispute that the subject vehicle was inoperable and creating a hazardous situation, and thus, pursuant to department policy, the officers were obligated to have the vehicle impounded and to conduct an inventory of the vehicle to safeguard the owner's property"); People v. Hanks, 275 AD2d 1008 [4th Dept. 2000]); where the car cannot be operated because it is unregistered, uninsured, or uninspected (see, e.g., People v. Marasa, 284 AD2d 971 [4th Dept. 2001]); or where the car was driven by an unlicensed driver or a driver whose license is suspended, and no one is legally able to drive the car (see, e.g., People v. Jackson, 241 AD2d 557 [2d Dept. 1997] (Defendant's vehicle was properly impounded where neither he nor his passenger had a valid driver's license); People v. Johnson, 298 AD2d 281 [1st Dept. 2002]; People v. Wilburn, 50 AD3d 1617 [4th Dept. 2008] (police could impound a vehicle where the defendant had no valid license and the passenger was unable to drive the vehicle); People v. Willette, 73 AD3d 1278 [3rd Dept. 2010]).
In summary, the decision to impound a vehicle is reasonable if there is a valid reason to move it, a legitimate basis to hold it for further investigation, or if there is no other person present who can safely drive it away.
While the Court acknowledges that the vehicle can be seen partially in the road, near a fire hydrant, and possibly impeding traffic, there was absolutely no other testimony as to the status of the vehicle (see, e.g., People v. Rivera, 192 AD3d 920 [2d Dept. 2021]). In addition, there was no evidence presented that the car could not have been legally parked. Although the car was vouchered as "safekeeping," there was no testimony of any vandalism or burglary in the area where the car was parked (see e.g. Tardi, 28 NY3d at 1078 [2016] (vehicle properly impounded where "[u]pon the defendant's arrest, the vehicle would have been left unattended indefinitely in the complainant's private parking lot, which had a history of vandalism, and the complainant requested that the police remove the vehicle")). Nor was there any testimony as to issues with the registration, inspection or insurance of the vehicle. The Court also notes that the driver of the vehicle and the defendant can be heard on the body-worn camera footage shouting to someone about getting the car. This suggests that officers on the scene were aware that someone on the scene may have been available to move the vehicle (cf. People v. Walker, 20 NY3d 122 [2012])).
Moreover, the People elicited no testimony or evidence that the police impounded the vehicle under any police regulations, let alone reasonable ones. They presented zero evidence as to whether the NYPD "had a policy regarding impoundment of vehicles, what that policy required, or whether the [police] complied with that policy when [they] impounded the defendant's vehicle." (People v. Weeks, 182 AD3d 539, 541 [2d Dept.202]; see, e.g., People v. Davis, 205 NYS3d 740 [2024]; see, e.g., People v. King, 188 AD3d 721 [2d Dept. 2020] (People failed to present evidence of an NYPD procedure regarding impoundment or whether the officer complied with such procedure when he impounded the defendant's vehicle)). Instead, Officer Lajoie simply testified that the vehicle was transported back to the precinct for "safekeeping purposes" (Tr. at 9-10, 33). Thus, this case is distinguishable from Tardi, for example, where the record showed that "the police officers' decision to tow defendant's vehicle ... was properly made in accordance with standard criteria set forth in the police department's written policy" (Tardi, 28 NY3d at 1078). Likewise, in Walker, testimony was elicited from the trooper that it was procedure to tow a vehicle whenever the operator's license was suspended or revoked and the registered owner was not present (Walker, 20 NY3d at 125). While the People did introduce the NYPD policy that governs inventory searches of vehicles into evidence, that policy does not address the initial impounding (see People's Exhibit 1).[FN2]

Accordingly, the impoundment of the defendant's vehicle was unlawful and the physical evidence that was recovered from the vehicle during the inventory search subsequent to the impoundment must be suppressed as fruits of the unlawful impoundment.

 B. Huntley
The People provided notice of a statement made by the defendant to law enforcement [*7]personnel that they planned on using in their direct case (see CPL § 710.30[1][a]; see People's Notice and Disclosure Forms). 
A statement made by a defendant may not be used against him during a criminal trial unless it is proven beyond a reasonable doubt that the statement was voluntarily made (see CPL § 60.45[1]; see People v. Huntley, 15 NY2d 72 [1965]); see People v. Grillo, 176 AD2d 346 [2d Dept. 1991]). A statement is deemed to be "involuntary" if it was coerced by the use or threatened use of physical force, or improper conduct or undue pressure "which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement" (CPL § 60.45[2][a]). In a challenge to the voluntariness of a statement, the court must examine the totality of the circumstances under which the statement is made, including the characteristics of the accused and the circumstances under which the statement was made, including the duration and conditions of the detention, the age, physical state and mental state of the defendant, and whether the defendant was provided food, water, bathroom breaks (see People v. Guilford, 21 NY3d 205, 208 [2013]; see People v. Sakadinsky, 239 AD2d 443 [2d Dept. 1997]; see People v Brown, 113 AD3d 785 [2d Dept. 2014]; see People v. Hall, 145 AD3d 915 [2d Dept. 2016]; see People v. Johnson, 139 AD3d 967 [2d Dept. 2016]).
A statement obtained by law enforcement may also be deemed involuntary if obtained by certain improper promises or statements of fact or in violation of the State or Federal constitution (CPL § 60.45(2)(b)(i) and (ii)). One of those constitutional rights, the privilege against self-incrimination, is protected by the Miranda rule (see People v. Berg, 92 NY2d 701 [1999]). "Because the privilege applies only when an accused is 'compelled' to testify, the safeguards required by Miranda are not triggered unless a suspect is subject to 'custodial interrogation'" (Berg, at 704). "Both the elements of police 'custody' and police 'interrogation' must be present before law enforcement officials constitutionally are obligated to provide the procedural safeguards imposed upon them by Miranda" (People v. Huffman, 41 NY2d 29, 33 [1976]). A suspect is in custody if, in that same situation, a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave (see People v. Harris, 48 NY2d 208, 215 [1979]; People v. Yukl, 25 NY2d 585, 589 [1969]). "The term 'interrogation' under Miranda refers not only to express questioning but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response" (People v. Ferro, 63 NY2d 316, 322 [1984], quoting Rhode Island v. Innis, 446 US 291, 301 [1980]).
The defendant was undoubtedly in custody at the time he made the statements testified to by the officer at the hearing. However, there is no evidence to suggest the officers attempted to elicit incriminating statements from him, whether by direct questions or by their conduct. Here, the defendant was not promised anything, threatened, or coerced (People v. Witherspoon, 66 NY2d 973, 974 [1985]). There was no evidence, as the defendant would argue, that the statement was made under the pressure or coercion of the codefendant.
Accordingly, the Court finds that the People have proven beyond a reasonable doubt that the defendant's statements were made knowingly, intelligently, and voluntarily, and the motion to suppress the defendant's statement is denied. 
This constitutes the Decision and Order of the Court.
Dated: November 13, 2024
Kings County, New York

Footnotes

Footnote 1:The Court notes that a review of the officer's body worn camera footage does now show the car move at any point or show the officer's car lights on (see People's Exhibit 2 — Body-Worn Camera Footage of Officer Guiteau). However, the Court recognizes that this could be an issue of vantage point from the placement of the camera and does not see this as a basis to find the officer's testimony to be incredible or inaccurate.

Footnote 2:The Court notes that the officers may have been permitted to conduct a search of the vehicle on the scene if they believed it contained contraband, a weapon, or evidence of a crime (see generally, Arizona v. Gant, 556 US 332 [2009]; see also People v. Guerra, 2022 NY Misc. Lexis 3401 [Sup. Ct. Queens Co. 2020]). However, no such search was done in this case and the matter of an on scene post-arrest safety search is distinct from an impound and inventory search, and the burden is on the People as to that search.